# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 62

APRIL TERM, A.D. 2013

May 17, 2013

IN THE MATTER OF THE WORKER'S COMPENSATION CLAIM OF:

KIRK JACOBS,

Appellant
(Petitioner),

v.

No. S-12-0220

STATE OF WYOMING, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Laramie County*
*The Honorable Peter G. Arnold, Judge*

*Representing Appellant:*

  *William G. Hibbler, Bill G. Hibbler, PC, Cheyenne, Wyoming.*

*Representing Appellee:*

  *Gregory A. Phillips, Attorney General; John D. Rossetti, Deputy Attorney General; Michael J. Finn, Senior Assistant Attorney General; Kelly Roseberry, Assistant Attorney General.*

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

**NOTICE:** **This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BURKE, Justice.**

[¶1]    The Wyoming Workers' Safety and Compensation Division awarded benefits to Appellant, Kirk Jacobs, after he experienced a workplace injury.  Mr. Jacobs sought payment for prescription medication that he claimed was related to his workplace injury. The Division denied the claim.  Mr. Jacobs requested a contested case hearing, and the Medical Commission upheld the Division's determination. Mr. Jacobs appealed to the district court, which affirmed the Medical Commission's order.  He challenges the district court's decision in this appeal.  We affirm.

## *ISSUES*

[¶2]   Mr. Jacobs states the issues as follows:

> I.      Was the commission decision holding that Mr. Jacobs did not meet his burden of proof that he was entitled to continuation of medical benefits supported by substantial evidence?
>
> II.     Did the Division's prior determination, assigning a 78% whole body permanent physical impairment rating, establish as a matter of law that Mr. Jacobs' chronic abdominal pain was directly related to his initial compensable toe injury?
>
> III.    Did the commission properly apply the recognized second compensable injury burden of proof?

The Division phrases the issues as follows:

> I.      Did the Commission apply the proper burden of proof for a second compensable injury when it required Jacobs to establish a causal connection between his abdominal pain and his Keflex ingestion?
>
> II.     Did substantial evidence support the Commission's determination?

## *FACTS*

[¶3]    This is the fifth time Mr. Jacobs' case has been before this Court.  *See State ex rel. Wyo. Workers' Comp. Div. v. Jacobs*, 924 P.2d 982 (Wyo. 1996) (*Jacobs I*); *Jacobs v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2004 WY 136, 100 P.3d 848 (Wyo.

1

2004) (*Jacobs II*); *Jacobs v. State ex rel. Wyo. Med. Comm'n*, 2005 WY 104, 118 P.3d 441 (Wyo. 2005) (*Jacobs III*); *Jacobs v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 118, 216 P.3d 1128 (Wyo. 2009) (*Jacobs IV*). This appeal, however, represents the first time that the connection between Mr. Jacobs' workplace injury and his abdominal pain has been ripe for our review. Despite the long and complicated procedural history in this case, the facts pertinent to this appeal are relatively straightforward.

[¶4]   Mr. Jacobs experienced a work-related injury in September, 1982, when he dropped a piece of rebar on his right fifth toe. He had surgery to repair the toe in December, 1982, and he subsequently developed an infection in the toe. His treating physician prescribed a ten-day course of Keflex, an antibiotic, to stop the infection from spreading. After taking the second dose of Keflex, Mr. Jacobs experienced abdominal pain and swelling. He contacted his treating physician and told him about the pain, but was instructed to continue taking the antibiotic. Towards the end of his course of Keflex, Mr. Jacobs began producing loose, bloody stools. He was referred to Dr. Bertrand Honea, an internist, who diagnosed Mr. Jacobs with antibiotic-induced colitis. Over the next couple of years, Mr. Jacobs' colitis periodically returned after he consumed monosodium glutamate (MSG). The colitis eventually resolved after Mr. Jacobs started monitoring the ingredients in the food he consumed and adjusted his diet to eliminate MSG. However, he continued to experience chronic abdominal pain, which he claims has never subsided.

[¶5]   The Workers' Safety and Compensation Division awarded temporary total disability benefits to Mr. Jacobs following his workplace injury. In 1990, after initially questioning whether Mr. Jacobs' impairment was related to his original workplace injury, the Division awarded permanent partial impairment benefits to Mr. Jacobs based on a 78% whole body impairment rating provided by Dr. Carol Newlin. The Division paid impairment and medical benefits to Mr. Jacobs until March, 2003, when the Division issued a final determination denying benefits relating to treatment of Mr. Jacobs' abdominal pain. The Division concluded that treatment for Mr. Jacobs' abdominal pain, which included prescriptions for pain medication, was not related to his original workplace injury.

[¶6]   Mr. Jacobs objected to the Division's final determination and requested a contested case hearing. The Medical Commission held the contested case hearing on October 28, 2003 to determine whether Mr. Jacobs' abdominal pain was related to his original workplace injury. However, as we explained in *Jacobs IV*, ¶ 7, 216 P.3d at 1131, before the Commission could issue a decision on the merits, both the Division and Mr. Jacobs filed competing motions requesting summary judgment on grounds of *res judicata* and collateral estoppel. The Commission granted the Division's motion after concluding that Mr. Jacobs' claim for benefits relating to his chronic abdominal pain was barred by the doctrine of collateral estoppel. *Id.* We reversed the Commission's decision

in *Jacobs III*, after finding that the Commission did not have subject matter jurisdiction to decide the claim. *Jacobs IV*, ¶ 8, 216 P.3d at 1131. Following remand, the case was ultimately referred to the Office of Administrative Hearings (OAH). *Id.*, ¶ 9, 216 P.3d at 1131. Based on the evidence in the record, the OAH concluded, as the Medical Commission had, that Mr. Jacobs' claim for benefits related to his chronic abdominal pain had already been decided and was barred under the doctrines of *res judicata* and collateral estoppel. *Id.*, ¶ 13, 216 P.3d at 1132-33. We reversed that decision in *Jacobs IV*, after finding that, because no prior adjudication had resulted in a judgment on the merits, the OAH should not have decided the matter on collateral estoppel. As a result, we remanded the case once again. *Id.*, ¶ 17, 216 P.3d at 1134.

[¶7] Upon remand from *Jacobs IV*, after both parties submitted disclosure statements containing numerous exhibits, the Medical Commission held a contested case hearing on October 28, 2010. After the hearing, the Commission issued an order affirming the Division's March 27, 2003 final determination denying benefits relating to treatment of Mr. Jacobs' abdominal pain. The Commission concluded that Mr. Jacobs had failed to provide credible medical evidence to support the contention that his abdominal pain was causally related to his workplace injury. Mr. Jacobs appealed the Commission's decision to the district court, and the district court affirmed. He timely filed this appeal.

## *STANDARD OF REVIEW*

[¶8] Review of an administrative agency's action is governed by the Wyoming Administrative Procedure Act, which provides that:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> . . .
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
> > (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

3

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2009). We review an administrative agency's findings of fact pursuant to the substantial evidence test. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.*, ¶ 11, 188 P.3d at 558. Findings of fact are supported by substantial evidence if, from the evidence in the record, this Court can discern a rational premise for the agency's findings. *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 118, ¶ 11, 259 P.3d 1161, 1164 (Wyo. 2011). When the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. *Dale*, ¶ 22, 188 P.3d at 561.

[¶9] The arbitrary and capricious standard of review is used as a "safety net" to catch agency action which prejudices a party's substantial rights or which may be contrary to the other review standards under the Administrative Procedure Act, yet is not easily categorized or fit to any one particular standard. *Dale*, ¶ 23, 188 P.3d at 561. The arbitrary and capricious standard applies if the agency failed to admit testimony or other evidence that was clearly admissible, or failed to provide appropriate findings of fact or conclusions of law. *Id.* We review an agency's conclusions of law *de novo*. *Id.*, ¶ 26, 188 P.3d at 561.

## *DISCUSSION*

### *Substantial Evidence*

[¶10] In his first issue, Mr. Jacobs contends that the Medical Commission's decision upholding the Division's denial of benefits relating to his abdominal pain was not supported by substantial evidence. He acknowledges that "The overwhelming weight of

the evidence presented in this case supports that . . . NO treating or evaluating physician is able to specifically identify either an etiology or diagnosis for Mr. Jacobs' chronic abdominal pain." He asserts, however, that the temporal relationship between his workplace injury and his abdominal pain "must be accepted as a sound medical causal link between injury and pain." Accordingly, Mr. Jacobs contends that the Commission erred in disregarding evidence relating to the temporal connection between his ingestion of Keflex and his abdominal pain.

[¶11] A claimant in a worker's compensation case has the burden to prove all of the elements of the claim by a preponderance of the evidence. *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 22, 247 P.3d 845, 851 (Wyo. 2011). A preponderance of the evidence is "proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence." *Id.* It is undisputed that Mr. Jacobs experienced a compensable, work-related injury to his toe in September, 1982. However, Mr. Jacobs also had the burden to prove, by a preponderance of the evidence, that his abdominal pain was causally related to his workplace injury.

> "[T]he causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation or acceleration of the injury. We do not invoke a standard of reasonable medical certainty with respect to such causal connection. Testimony by the medical expert to the effect that the injury 'most likely,' 'contributed to,' or 'probably' is the product of the workplace suffices under our established standard . . . .
>
> [U]nder either the 'reasonable medical probability' or 'more probable than not' standard, [a claimant succeeds] in demonstrating the causal connection by a preponderance of the evidence."

*Anastos v. Gen. Chem. Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 666 (Wyo. 2005) (quoting *Hall v. State ex rel. Wyoming Workers' Compensation Div.*, 2001 WY 136, ¶ 16, 37 P.3d 373, 378 (Wyo. 2001)).[1]

---

[1] Our precedent indicates that medical expert testimony is not always required to establish causation. *See, e.g., Gray v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2008 WY 115, ¶ 17, 193 P.3d 246, 251-52 (Wyo. 2008); *Forni v. Pathfinder Mines*, 834 P.2d 688, 693 (Wyo. 1992); *Hansen v. Mr. D's Food*

[¶12] Mr. Jacobs' abdominal pain was treated and evaluated by over twenty doctors during the 28 years that elapsed between the onset of his abdominal pain and the Medical Commission's final hearing in this case. The Medical Commission devoted approximately twenty pages of its thirty-page order to the voluminous medical history and opinions generated by these medical providers. As indicated in the summary that follows, despite the postulation of various diagnoses, that evidence was uniform in its failure to provide a medical explanation for Mr. Jacobs' symptoms.

[¶13] In January, 1984, Mr. Jacobs saw Dr. John Singleton, a Professor of Medicine within the Division of Gastroenterology at the University of Colorado Health Science Center, due to his ongoing abdominal discomfort. Dr. Singleton reported that Mr. Jacobs had a "[p]uzzling complex of symptoms possibly due to monosodium glutamate (MSG) sensitivity." Dr. Singleton concluded, under the "Impression" section of his report, that "I cannot make a connection between these symptoms and the Keflex administration during which they began." In December, 1985, Mr. Jacobs sought treatment for his abdominal pain at the Mayo Clinic. In a letter to Dr. Honea from Dr. Craig Peine, a gastroenterologist and internist at the Mayo Clinic, Dr. Peine indicated that Mr. Jacobs' abdominal pain was of "unknown etiology" and suggested additional diagnoses:

> When seen in Neurology by Dr. M. Silber, they found Mr. Jacobs' EMG within normal limits and requested a Minnesota Multiphasic Personality Inventory, the gastroenterology consultation, and possibly a psychiatric consultation. It was Doctor Silber's opinion that there was no clinical evidence to suggest a neuropathy or radiculopathy and that the patient's symptoms may represent functional disease or irritable bowel syndrome.
>
> It was our impression that Mr. Jacobs was experiencing abdominal wall discomfort of unknown etiology. We were concerned with his excessive use of

---

*Center*, 827 P.2d 371, 373 (Wyo. 1992). However, in *Thornberg v. State ex rel. Wyo. Workers' Comp. Div.*, 913 P.2d 863, 867 (Wyo. 1996), we recognized that "under certain circumstances, medical testimony may be essential to establish a causal connection." Similarly, in *Middlemass*, ¶ 34, 259 P.3d at 1169, we stated that "in many cases expert testimony will be required." In those decisions, we indicated that expert testimony may not be necessary where the medical condition complained of is "immediately and directly or naturally and probably" the result of the workplace incident. *Id.*, ¶ 33, 259 P.3d at 1169; *Thornberg*, 913 P.2d at 867. Mr. Jacobs does not claim that the connection between his workplace accident and his abdominal pain can be established by lay testimony, and the circumstances of this case do not suggest that a connection could be established absent expert testimony.

6

alcohol and felt that the elevation in his liver functions was secondary to this. We felt that the mild elevation in his serum bilirubin probably represented Gilbert's syndrome.

Although Mr. Jacobs was scheduled for a follow-up visit at the Mayo Clinic, Ms. Jacobs testified that Mr. Jacobs did not keep the appointment because the physicians at the Mayo Clinic had administered the EMG "on the wrong side" of Mr. Jacobs. In response to this testimony, the Medical Commission stated that

> Ms. Jacobs' statement about the EMG being done incorrectly by the Mayo Clinic is not credible. All electromyogram (EMG) studies are done bilaterally for comparison purposes. Even though we were not provided the actual EMG studies that were conducted, we feel that Mr. Jacobs missed an opportunity for follow-up care and diagnostics with the Mayo Clinic, which is recognized throughout the medical community as a premier medical facility.

[¶14] In June, 1987, Mr. Jacobs saw Dr. James Bush, an internist practicing in Fort Collins, Colorado, for an evaluation of his chronic abdominal pain. In a letter written to Mr. Jacobs' counsel in November, 1987, Dr. Bush stated that "My diagnosis currently is that he is suffering from irritable bowel syndrome; MSG sensitivity; question intermittent inflammatory bowel disease. However no signs of active inflammatory process at this time." Dr. Bush further stated that

> [T]he relationship of his current condition to the administration of Keflex is a difficult question. Certainly historically his problems seem to all date from that time. Unfortunately, I can find no direct causal relationship between the disease process at that time and his current symptoms. One could certainly postulate that as he had no intestinal symptoms prior to this, that there might be some direct cause and effect. I have been unaware of this, and also my consult in gastroenterology did not feel there was a direct cause and effect relationship.

As indicated in his letter, Dr. Bush had referred Mr. Jacobs to Dr. Robert Simmons, a gastroenterologist, who saw Mr. Jacobs in Fort Collins in September, 1987. In a letter to Dr. Bush, Dr. Simmons stated as follows:

> My feeling is that [t]his patient has irritable bowel syndrome. Post prandial diarrhea, past history of hard stool, [and] abdominal pain and tenderness are consistent with this

7

diagnosis. The presumably negative work-up also supports this. The poor response to a variety of medications, which are often helpful in irritable bowel syndrome[,] may represent simply therapeutic failures of perhaps ineffective secondary gain. It is somewhat critical as to what this patient[']s organic work-up consists of. The history of abnormal sigmoidoscopies is concerning, but I think not likely real. The history of antibiotic associated colitis is quite atypical and I question whether he ever had that disorder. I feel that his problem is gastrointestinal, but not likely organic.

[¶15] In July, 1988, after a review of Mr. Jacobs' medical records, Dr. Charles Lyford, an internist and gastroenterologist, stated in an affidavit that he agreed with the conclusions reached by Drs. Singleton, Bush, and Simmons as to the lack of causal connection between Mr. Jacobs' injury and his abdominal symptoms:

13. It is [Dr. Lyford's] opinion that Dr. John W. Singleton of the University of Colorado Health Science Center is correct in his conclusion that there was no causal connection between the "puzzling complex of symptoms possibly due to monosodium glutamate sensitivity" and the ingestion of KEFLEX. . . .

14. It is [Dr. Lyford's] further opinion that Dr. James F. Bush and Robert F. Simmons are correct in their conclusion that there is no causal connection between the ingestion of KEFLEX and the symptoms exhibited by Mr. Jacobs after September of 1983.

15. It is [Dr. Lyford's] opinion that the complex of symptoms presented by Mr. Jacobs after September of 1983 represents a complex that is unique and which has not previously been reported or expected from the ingestion of drugs such as KEFLEX if, indeed, any relationship exists between the complex of symptoms and the use of KEFLEX.

[¶16] In addition to the evidence indicating that the cause of Mr. Jacobs' abdominal pain was unknown, the Medical Commission was also presented with evidence of Mr. Jacobs' heavy narcotic use, which suggested a "non-physiologic component" to Mr. Jacobs' pain disorder, as well as the possibility that Mr. Jacobs was motivated by a desire for secondary gain. In June, 1998, at the request of the Division, Mr. Jacobs saw Dr. Ron Carbaugh, a psychologist, for a psychosocial evaluation. Dr. Carbaugh noted that Mr. Jacobs was taking MS Contin, morphine, and lorazepam for his abdominal pain. In

the "Conclusions and Recommendations" section of his assessment, Dr. Carbaugh stated as follows:

> This individual is currently very dependent on narcotics for pain relief. However, despite this narcotic intake, he remains quite dysfunctional. Neither he nor his wife are interested in pain management strategies, and their goal appears to be to get . . . Dr. Port[e]noy at Beth Israel in New York to have a morphine pump inserted for pain relief.
>
> Given Mr. Jacobs' level of dysfunction and his opiate dependence, he is a candidate for a pain management program. However, an inpatient drug detoxification program would need to be considered before a pain management program. Prognosis for a successful outcome would be poor at this time, since the patient's motivation appears to be to maintain his narcotic dependence through the use of a morphine pump. There appears to be little distress on either his or [his] wife's part, given his current level of dysfunction. As a result, they are not receptive to considering a pain management program.
>
> The results of this assessment do suggest a non-physiologic component to Mr. Jacobs' pain disorder. It would appear that [t]his client's pain experience is being significantly and adversely maintained for psychosocial reasons. Likely secondary gain issues include (1) dependency gratification, allowing him to obtain support from others, (2) allowing him to avoid responsibilities and demands, (3) a way to maintain his opiate dependence.

[¶17] In September, 1998, Mr. Jacobs was seen by Dr. Russell Portenoy, a physician specializing in pain management at the Beth Israel Medical Center in New York. The results of that evaluation were summed up in a review of Mr. Jacobs' medical records conducted by Dr. Peter Perakos, a gastroenterologist in Cheyenne, in October, 1998:

> During the course of his multiple evaluations, there has been no abnormality identified in the GI system to explain his pain. The records from the Beth Israel Medical Center Pain Medicine & Palliative Care initial evaluation are quite revealing. "We cannot establish the etiology of this pain from physical exam and history, could be any intramedullary process, neurologic disease, or could be a visceral problem

that set off a chronic pain syndrome.  For now it is a disease
of its own."

Further, Dr. Perakos noted that Mr. Jacobs "has at this point now become profoundly addicted to narcotics with 3200 mg of MS CONTIN per day and an extra 160 mg of oral MORPHINE every two to four hours."  Dr. Perakos concluded that, "In summary, Mr. Jacobs is a narcotic addict with chronic pain of unknown etiology and unable to perform many activities of daily living.  He is dependent on others for his survival and has become an invalid in the process."

[¶18]  The issue of Mr. Jacobs' psychologic condition was also raised by Dr. Bruce Lockwood, a rehabilitation specialist who provided an independent medical evaluation (IME) of Mr. Jacobs in relation to his claim for worker's compensation benefits for his right and left total knee replacements.  Dr. Lockwood concluded that Mr. Jacobs' knee replacements were not related to his 1982 workplace injury.[2]  Dr. Lockwood also noted that he was concerned about the unidentified cause of Mr. Jacobs' abdominal pain, as well as his narcotics use:

> Furthermore, in reviewing the medical records made available to me, I have significant concerns about the lack of a specific etiology behind [Mr. Jacobs'] recurrent abdominal pain.  It may very well have been that he [had] a Keflex-induced pseudomembranous colitis in 1983.  However, his consistent abdominal pain and the etiology behind this abdominal pain is not clear to me in reviewing the medical records, nor is it clear to Mr. Jacobs and his wife.

> Thus, it is exceedingly difficult to grasp the etiology behind his recurrent abdominal pain, let alone the lack of specific diagnosis causing this pain with multiple health care providers and their reviews being completed and again the specific cause not being clear.  It also brings into concern his significant amount of medications which raise concerns about their use for this chronic pain of unclear etiology.  These include methadone, lorazepam, and Ritalin.  Again, I would recommend careful consideration of his psychologic condition and how this may impact his perception of pain and

---

[2] The Workers' Compensation Division ultimately issued a final determination denying benefits relating to Mr. Jacobs' knee replacements.  In *Jacobs II*, ¶ 1, 100 P.3d at 849, we noted that Mr. Jacobs did not object to the Division's denial of benefits relating to the knee replacements.

need for these medications. I would recommend critical continued evaluations of his overall general medical condition and his need for these medications in concert with addressing his psychologic condition and how this may impact those factors.

A second IME was provided by Dr. Harmon Davis, an internist practicing in Cheyenne, in conjunction with Mr. Jacobs' total knee replacements. In his report, Dr. Davis stated:

> In reviewing and analyzing all of the data, I think that we have a great deal of difficulty. I think that a case can be made that [Mr. Jacobs'] current condition does relate to the original injury. This is based on the facts of the case in that he obviously had the onset of this unremitting chronic abdominal pain after being given Keflex. The difficulty I have is why that should happen. Other than the patient's report, I can find no documentation that this should happen. It is quite clear that the patient relates his chronic abdominal pain to the taking of the Keflex which was for the foot injury. The problem is, what did the Keflex cause, if anything, or is this an independent process and I am not capable of ferreting those two factors out. It is quite clear to me that over the last ten years, the patient has had very little work done toward attempting to diagnose his abdominal pain and its cause. This makes me very uncomfortable. What the effort has been mostly has been to control the patient's pain.

Ultimately, Dr. Davis concluded that "I truly feel that at the present time, we have a gentleman who has severe neuropathic abdominal pain of an undetermined etiology which may or may not relate to the Keflex which was originally given to him for his original injury and we really cannot go beyond that statement."

[¶19] After reviewing all of the evidence, the Medical Commission stated that

> This Medical Panel has carefully reviewed the voluminous medical records and reports submitted by the parties and finds that Mr. Jacobs has not met his burden of proof in establishing that his chronic abdominal pain is causally related to the work-related injury of September 24, 1982, and the complications caused by the ingestion of Keflex to treat the work injury. Mr. Jacobs' medical workups have been extensive and far reaching. He has been sent to the Mayo Clinic, although he failed to follow-up with that

institution for additional diagnostic testing. Mr. Jacobs was sent to Beth Israel Medical Center in New York City and to specialists in Washington State, and in Colorado. He has undergone numerous diagnostic workups from a variety of specialists, as outlined above, but has not been able to provide any credible medical evidence to show that his chronic ongoing abdominal pain is related to the work injury or the complications that derived from that injury. It has been noted that a wide variety of non-work-related conditions could also explain Mr. Jacobs' chronic abdominal pain, including an unrelated thoracic injury, liver dysfunction (fatty liver and elevated CPK levels), a hiatal hernia, a rib injury, Gilbert's Syndrome, somatic or psychiatric issues, porphyria, fibromyalgia or other conditions.

The Commission concluded that "It is clear that the Keflex induced colitis condition has long since resolved and no medical specialist has been able to provide an explanation of how a colitis condition would lead to the chronic abdominal pain that has persisted all these years."

[¶20] Mr. Jacobs concedes that neither his treatment providers nor the independent medical experts employed in this case were able to provide a medical explanation for his chronic pain symptoms. However, Mr. Jacobs contends that the Commission erred in disregarding evidence indicating a causal connection based on the temporal relationship between his workplace injury and his abdominal pain. In support of the claim that his abdominal pain resulted from his workplace injury, Mr. Jacobs emphasizes the deposition testimony of Dr. Albert Brady, an oncologist who treated Mr. Jacobs in 1990. Dr. Brady testified that he believed that Mr. Jacobs' ongoing pain was caused by the Keflex. More specifically, in response to a request for his opinion as to the cause of Mr. Jacobs' abdominal pain, Dr. Brady stated that:

> Well, you know, there were [sic] just a sequence of events that you all are painfully aware of, we're all painfully aware of. And it started with the injury and then the infection and the antibiotics. And it seems that in some way the antibiotics produced a gastrointestinal syndrome, which they're known to do, that then became the sort of inciting or etiologic event in terms of creating this neuropathic syndrome that Kirk has.

Mr. Jacobs also points to the deposition testimony of Dr. Robert Seamon, an internist who treated Mr. Jacobs between July 16, 2010 and August 25, 2010, approximately 27 years after Mr. Jacobs' abdominal pain began. Based on the medical history provided by Mr. Jacobs, Dr. Seamon stated that he thought it was "more probable than not" that

Mr. Jacobs' abdominal pain was related to his ingestion of Keflex. Finally, Mr. Jacobs relies on the permanent impairment evaluation performed by Dr. Newlin in 1990. Mr. Jacobs notes that, in her report, Dr. Newlin stated that his abdominal pain was "apparently a progression of neuropathic change (possible reflex sympathetic dystrophy) associated with the reaction to antibiotic, 1983."

[¶21] The record reveals, however, that the Medical Commission weighed all of this evidence. First, the Commission briefly addressed Dr. Newlin's impairment rating, in which she indicated that Mr. Jacobs' abdominal pain was "apparently" related to his colitis. However, Dr. Newlin offered no medical explanation to support such a connection. As a result, the Medical Commission questioned the validity of Dr. Newlin's impairment rating. More significantly, the Commission found that Dr. Brady provided the strongest opinion in support of a causal connection between Mr. Jacobs' workplace injury and his abdominal pain. The Commission noted, however, that even Dr. Brady's records indicated that Mr. Jacobs' chronic pain was of "unknown [etiology]." Indeed, in his deposition, Dr. Brady acknowledged that in formulating his opinion as to the cause of Mr. Jacobs' abdominal pain, he was "most impressed with the sort of temporal relationship and the apparent sequence of events." When asked to set aside the temporal relationship between Mr. Jacobs' colitis and the onset of his chronic pain symptoms, Dr. Brady agreed that colitis would be unlikely to cause a 20-year pain syndrome.

[¶22] The Commission also considered Dr. Seamon's testimony regarding the temporal relationship between Mr. Jacobs' colitis and his pain symptoms. The Commission noted that when asked whether he agreed with Dr. Brady's testimony regarding the cause of Mr. Jacobs' abdominal pain, Dr. Seamon stated that

> Well, what I'd probably have to say at the outset, in general I've only seen Mr. Jacobs over the short period of time he's been a patient here. The broader concept of what Dr. Brady is getting at is that even though it appears that we can't make a clear connection between the colitis illness, it seems likely, at least from the standpoint of the timing, that the two are connected, even if we can't provide a mechanism to explain it readily.

Dr. Seamon also stated that Mr. Jacobs' symptoms could have resulted from irritable bowel syndrome, which had been previously diagnosed by several of Mr. Jacobs' medical providers.

> Well, irritable bowel can certainly cause abdominal pain. And I think that's probably – that's probably the most basic statement that you can make about it. Whether – Unfortunately, for irritable bowel there's no simple diagnostic

13

test that you can actually apply to make the diagnosis. It's partially a diagnosis of exclusion, which means you've excluded other potential causes for [gastro-intestinal] symptoms and abdominal pain.

So I think it would be like any of the other things. It might be proposed for the mechanism of Mr. Jacobs' pain as a possible explanation.

Unfortunately, in some ways it's a harder diagnosis to establish, and many times a harder diagnosis to actually effectively treat.

So I don't know how one could rule it in or rule it out in his situation.

It doesn't seem like from what's been stated, at least in the available records, and even in this to some extent, that the treatment for irritable bowel, if that's what it was, was effective for him.

So I'm afraid I can't really shed too much light on that.

Dr. Seamon testified that it was difficult to say whether Mr. Jacobs' alcoholism contributed to his abdominal pain and stated that Mr. Jacobs had not disclosed that he suffers abdominal pain if he consumes MSG. Additionally, Dr. Seamon acknowledged that there were numerous other potential explanations for Mr. Jacobs' abdominal pain and conceded that "the only thing that argues for the connection between the illness in 1982, and the subsequent development of the abdominal pain is just the timing." Finally, Dr. Seamon conceded that establishing any causal connection between Mr. Jacobs' ingestion of Keflex and his abdominal pain was "speculative from the standpoint that you cannot readily make a direct logical connection."

[¶23] Based on this testimony, the Medical Commission disregarded Dr. Seamon's opinion:

The opinion of Dr. Robert Seamon is disregarded in this matter. Dr. Seamon has only been treating Mr. Jacobs for a brief period of time, and has only a limited working knowledge of Mr. Jacobs' extensive medical history. His opinion was primarily based upon a "temporal connection" that exists between Mr. Jacobs' abdominal pain and the date of the work injury, but he could not point to any credible

14

medical evidence that would explain the connection beyond the timing of the condition. This Panel notes that the majority of physicians in this case have also noted the temporal connection in this matter, even though the Keflex induced colitis has long since resolved. There has been no credible explanation by Dr. Seamon or others that explains how the colitis or other complications of the work-related injury would provide a basis for Mr. Jacobs' chronic abdominal pain condition that is now approximately 28-years in duration. It is noteworthy that even Mr. Jacobs' strongest medical advocate, Dr. Brady, was unable to explain the etiology of the condition and its relationship to the work injury.

[¶24] The Medical Commission's decision to disregard the testimony of Drs. Brady and Seamon is consistent with our precedent holding that the Medical Commission is not bound to accept speculative medical testimony. In *Anastos*, 120 P.3d 658, the Medical Commission was presented with similar testimony regarding a temporal relationship between the claimant's workplace accident and the subsequent onset of headaches.

> While none of the doctors who examined and treated Anastos were able definitively to diagnose the cause of his headaches, Drs. Digre, Crane, and Whipp all acknowledged that based on information provided by Anastos, there seemed to be a temporal relationship between the reported headaches and his injury. However, the Medical Commission concluded that
>
> > the doctors who examined Mr. Anastos are unclear as to the cause of these headaches. At best the various doctors speculate that Mr. Anastos' headaches may be migraines, muscle-tension, low pressure, cervical, positional or exertional.
>
> We have held that speculative medical testimony is insufficient to satisfy a claimant's burden of proof. *Frazier v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 997 P.2d 487, 490 (Wyo. 2000). None of the tests Anastos underwent revealed any physiological problem causing his headaches, and no doctor ever definitively diagnosed a cause or proper treatment.

*Id.*, ¶ 21, 120 P.3d at 666-67. We concluded that "Because of their speculative nature, the Medical Commission was not bound to accept the expert medical opinions in the

instant case." *Id.*, ¶ 24, 120 P.3d at 667. After noting that the Medical Commission also determined that the claimant's testimony regarding the cause of his headaches lacked credibility, we affirmed the Medical Commission's conclusion that the claimant had failed to meet his burden of proof. *Id.*, ¶ 24, 120 P.3d at 667-68. Similarly, in the present case, in light of the speculative nature of Dr. Brady's and Dr. Seamon's testimony, the Medical Commission did not err in concluding their testimony was insufficient to satisfy Mr. Jacobs' burden of proof.

[¶25] In sum, after weighing all of the evidence presented, the Medical Commission concluded that the "overwhelming weight of the evidence submitted in this matter fails to identify a causal link between [Mr. Jacobs'] current abdominal complaints and his 1982 work-related injury." We find substantial evidence to support that conclusion, as well as the Commission's decision to reject the opinions of Drs. Brady and Seamon, which were based solely on the timing of Mr. Jacobs' abdominal pain. Because Mr. Jacobs was unable to establish a causal connection between his workplace injury and his abdominal pain, the Commission properly concluded that Mr. Jacobs failed to satisfy his burden of proving his entitlement to benefits.

### *Effect of Division's 1990 Formal Determination*

[¶26] In his next issue, Mr. Jacobs contends that the Division's formal determination, issued March 9, 1990, awarding permanent partial impairment benefits to Mr. Jacobs, constitutes "unrefuted substantial evidence that permanently determined the causal relationship between the work-related injury and the chronic abdominal pain[.]" (Emphasis omitted.) We find no merit in this claim. As noted above, the Division's determination was based on the impairment rating provided by Dr. Newlin. That impairment rating, however, was rejected by the Medical Commission because it provided no medical explanation to support a connection between Mr. Jacobs' workplace injury and his abdominal pain. Additionally, that impairment rating was not "unrefuted," as asserted by Mr. Jacobs. After the impairment rating was issued, in 1990, Mr. Jacobs was treated and evaluated by over a dozen medical experts. As noted in our discussion of Mr. Jacobs' first issue, after weighing those opinions, the Medical Commission concluded that they did not establish a causal connection between Mr. Jacobs' workplace accident and his abdominal pain.

[¶27] Further, as we have previously noted, the Division's award of benefits does not guarantee the payment of future benefits:

> The Division's uncontested award of benefits is not a final adjudication that precludes the Division from challenging future benefits. *Tenorio v. State ex rel. Wyoming Workers' Compensation Div.*, 931 P.2d 234, 239 (Wyo. 1997). The statutory language of the Wyoming Workers'

16

Compensation Act confers finality on the benefits paid to the employee through uncontested determinations, subject to the exceptions found in Wyo. Stat. Ann. § 27-14-605. *Id.* [at 240]. The statutory language, however, does not guarantee a claimant future benefits on the basis of a prior award nor does public policy favor the payment of an unjustified worker's compensation claim. *Id.* Therefore, an employee/claimant must prove that he was entitled to receive benefits for all outstanding claims despite previous awards for the same injury. *Id.* [at 239].

*Hall*, ¶ 14, 37 P.3d at 377. Indeed, we stated as much in *Jacobs IV*, ¶ 15, 216 P.3d at 1133, in response to Mr. Jacobs' claim that the Division was precluded from denying benefits relating to his abdominal pain:

In the proceedings below and in this appeal, the appellant asserted that under the doctrine of collateral estoppel the Division is precluded from denying his claims for benefits. His argument is essentially based on the fact that the Division previously paid for the pain medication to treat his abdominal pain and recognized the existence of the condition in *Jacobs I*. We have said that a claimant is not guaranteed future benefits on the basis of a prior award. *Snyder v. State ex rel. Wyo. Workers' Comp. Div.*, 957 P.2d 289, 293 (Wyo. 1998). . . . Although we mentioned the appellant's abdominal pain in *Jacobs I*, the compensability of that condition was not at issue and, as we have already discussed, the record on appeal contains no order or final decision on the merits of that claim that would preclude the Division from later challenging the compensability of the appellant's chronic abdominal pain.

Contrary to Mr. Jacobs' assertion, the Division's award of permanent partial impairment benefits in 1990 does not, by itself, satisfy his burden of proving that his abdominal pain was related to his workplace injury.

***Burden of Proof***

[¶28] In his final issue, Mr. Jacobs contends that the Medical Commission did not apply the correct burden of proof to Mr. Jacobs' claim that his injury was causally related to his workplace accident. Mr. Jacobs correctly recognizes that he was required to prove all of the elements of his claim by a preponderance of the evidence. *Anastos*, ¶ 20, 120 P.3d at 666. He asserts, however, that the Commission applied a more onerous evidentiary burden. He bases this claim on the Commission's statement that it did not find "credible

medical evidence in the record that supports Mr. Jacobs' contention that his longstanding abdominal pain is directly caused by the work-related injury[.]" According to Mr. Jacobs, this statement indicates that the Commission required him "to prove that there **IS** a direct causal relationship between his chronic abdominal pain and the work-related compensable toe injury." (Emphasis in original.) In other words, Mr. Jacobs claims that the Commission required him to prove, with absolute certainty, instead of by a preponderance of the evidence, that his abdominal pain was related to his workplace accident. Again, we find no merit in Mr. Jacobs' claim.

[¶29] Mr. Jacobs was required to prove, by a preponderance of the evidence, that there was a direct causal relationship between his accident and his abdominal pain. The record reveals that the Commission correctly applied the requisite burden of proof. The Commission's order correctly cites the applicable law regarding the burden of proof and demonstrates its understanding that the claimant had the burden of proving the elements of his claim by a preponderance of the evidence. The Commission concluded that Mr. Jacobs "failed to present sufficient credible evidence to establish that his current abdominal care and treatment is causally related to the work-related injury." Although the Commission did not directly state that Mr. Jacobs failed to prove the elements "by a preponderance of the evidence," it is clear from the context of the Commission's order that it applied the burden correctly. Accordingly, we find no error in the Commission's application of Mr. Jacobs' burden of proof.

[¶30] Affirmed.