# IN THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 51

**APRIL TERM, A.D. 2023**

**May 30, 2023**

COURTNEY M. VANDOM,

Appellant
(Petitioner),

v.

STATE OF WYOMING, ex rel.
DEPARTMENT OF WORKFORCE
SERVICES, WORKERS'
COMPENSATION DIVISION,

Appellee
(Respondent).

S-22-0283

*Appeal from the District Court of Campbell County*
*The Honorable Matthew F.G. Castano, Judge*

*Representing Appellant:*
Weston T. Graham, Barney & Graham, LLC, Sheridan, Wyoming.

*Representing Appellee:*
Bridget Hill, Wyoming Attorney General; Mark Klaassen, Deputy Attorney General; Peter Howard, Senior Assistant Attorney General; Holli J. Welch, Senior Assistant Attorney General.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]   Courtney Vandom suffered a compensable work injury to her lower back on September 4, 2020.  In January 2021, the Workers' Compensation Division (Division) denied benefits for treatment to her upper back, neck, and arms (cervical spine) because these conditions were unrelated to her work injury.  Ms. Vandom requested a contested case hearing with the Office of Administrative Hearings (OAH) resulting in a denial of benefits based on a finding that Ms. Vandom's cervical spine, carpal tunnel, and cubital tunnel injuries were not causally related to her workplace injury.  Ms. Vandom appealed to the district court which affirmed the OAH.  Ms. Vandom claims the OAH's determination is unsupported by the evidence and is arbitrary, capricious, or otherwise not in accordance with the law.  We affirm.

## *ISSUE*

[¶2]   Ms. Vandom raises one issue:

> Was the OAH decision that Ms. Vandom did not meet her burden of establishing the causal relationship between her cervical spine injuries and her work-related accident unsupported by substantial evidence or otherwise arbitrary and capricious?

## *FACTS*

[¶3]   On September 4, 2020, while performing her duties as a lab tech, Ms. Vandom twisted her back while moving a wheeled coal crusher.  She filled out a hand-written report of injury the same day.  Because Ms. Vandom's handwriting was difficult to read, her supervisor typed the report of injury and brought the typed report to Ms. Vandom to review on September 10, 2020.  The typed report states that Ms. Vandom's injury was to her lower back, hips, and thighs, and she experienced numbness in her right fingers.  Ms. Vandom signed the typewritten report, although she later testified it was incomplete and she did not read it thoroughly before signing.

[¶4]   The day after her injury, Ms. Vandom went to the emergency room at Campbell County Hospital for medical treatment where she was treated by Dr. Jon Hayden.  The record of this visit states Ms. Vandom reported "lower back pain after twisting at work" and that "[w]hile she was maneuvering the machine, she had sudden, sharp, shooting low back pain that radiated down both legs."  The record also includes the doctor's notes that an examination of Ms. Vandom's neck "included findings of normal range of motion, Trachea midline, no cervical adenopathy, no tenderness."  The doctor noted, "[Ms. Vandom's] physical exam is consistent with lower back strain."

1

[¶5]    Eight days after her work injury, on September 12, 2020, Ms. Vandom was in a motorcycle accident. At the contested case hearing, she testified:

> I was at my daughter's birthday party, and I had gotten on a motorcycle. And the—I was just sitting on it, and the motorcycle popped into gear and took off. And I hit the—the back of a—I guess it was like the bumper part of a parked vehicle.

She said she received stitches for a laceration to her right arm but did not experience any pain in her neck.

[¶6]    On September 15, 2020, Ms. Vandom sought treatment from Dr. Robert Woodruff at Black Hills Orthopedic and Spine Center. The patient chart notes Ms. Vandom had been previously treated by Dr. Woodruff in 2019 and returned for a reevaluation after her September 4, 2020 injury. It describes her chief complaint as low back injury stemming from Ms. Vandom's report that "she was pushing and pulling some equipment in the lab and felt a pop in her back . . . and into her hamstrings and then numbness and tingling in her fingers." Dr. Woodruff ordered physical therapy and magnetic resonance imaging (MRI) of her cervical and lumbar spine. Dr. Woodruff also noted Ms. Vandom had "a right arm laceration that [has] been repaired" and "bruising on her bilateral legs from a bike accident." He observed that there was no "bruising scarring or swelling" in either the lumbar or cervical spine.

[¶7]    On September 23, 2020, the Division issued a final determination, concluding Ms. Vandom had suffered a compensable injury to her lumbar spine.

[¶8]    After completing the MRIs and six weeks of physical therapy, Ms. Vandom made a second visit to Dr. Woodruff. Dr. Woodruff noted the "predominant finding" of Ms. Vandom's recent MRI of the cervical spine "is degenerative disc disease . . . ." He stated:

> I want her to continue with her physical therapy . . . . I am concerned about the appearance of her cervical spine. She does have precocious degeneration with kyphosis[1] and spinal stenosis.[2] She is also having some weakness in her left hand.

---

[1] "Kyphosis is an exaggerated, forward rounding of the upper back." Mayo Clinic, *Kyphosis*, https://www.mayoclinic.org/diseases-conditions/kyphosis/symptoms-causes/syc-20374205 (last visited May 15, 2023).

[2] "Spinal stenosis, a narrowing of the spaces in your spine, can compress your spinal cord and nerve roots exiting each vertebrae." Cleveland Clinic, *Spinal Stenosis*, https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis (last visited May 15, 2023).

I would like to get an [electromyography (EMG)[3]] of her bilateral arms to rule out any carpal tunnel or cubital tunnel symptoms. If this is negative, then the likelihood is that the symptoms are coming from the spinal stenosis at C5-6 and C6-7.

[¶9]    Ms. Vandom received an upper extremity bilateral EMG on December 21, 2020. Dr. Woodruff called her on December 28 and left a message telling her that the EMG shows "very mild peripheral impingement" and her "symptoms are more likely coming from her cervical spine." He recommended a cervical disc replacement at C5-6 and C6-7 and asked her to call to discuss surgical options. On January 6, 2021, Dr. Woodruff ordered a cervical epidural steroid injection and discussed surgical recommendations with Ms. Vandom.

[¶10]  On January 8, 2021, January 22, 2021, and January 27, 2021, the Division denied payment for treatments for cervical spine, carpal tunnel syndrome, and cervical disc degeneration because these conditions were not related to Ms. Vandom's September 4, 2020 lumbar work injury. Ms. Vandom timely objected to these determinations and requested a contested case hearing.

[¶11]  On April 24, 2021, Dr. Ricardo Nieves conducted an impairment rating examination of Ms. Vandom. Dr. Nieves' report reflects that Ms. Vandom stated "on 9/4/2020 [she] injured her low back when she was prepping a sample as a Laboratory Technician. [She] reports that she was moving a crusher machine and twisted her back [and] reported lower back pain and numbness on her feet and hands." Dr. Nieves makes no reference to neck pain, and the pain diagram Ms. Vandom filled out for him indicates only low back pain and intermittent numbness and tingling in her hands and feet. After reviewing the medical records and performing a physical examination, Dr. Nieves found:

> 1.      Lumbar Disc Herniation and Spinal Stenosis with non-verifiable radicular complaints.
>
> 2.      Cervical spinal stenosis which in my professional opinion within a reasonable degree of medical probability is coincidental and not causally related to the 9/4/2020 work injury but related to degenerative changes. There are no physical exam findings of cervical radiculopathy or myelopathy.

---

[3] "Electromyography (EMG) is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons)." Mayo Clinic, *Electromyography*, https://www.mayoclinic.org/tests-procedures/emg/about/pac-20393913 (last visited May 15, 2023).

Dr. Nieves determined Ms. Vandom had reached maximum medical improvement at a 6% whole person impairment.

[¶12]   In her response to interrogatories on June 18, 2021, Ms. Vandom supplied a version of her work injury that was significantly different from those she had previously presented. She averred:

> The Claimant was working the overnight shift at Caballo Mine beginning at 6 pm on September 4, 2020. . . . Shortly after 6 pm, the Claimant was moving a crusher back to a safe operating position and upon putting the machine back the *Claimant immediately experienced sharp shooting pain **in both arms and her arms and fingers went numb, pain** went through her back and down into her legs*.

(Emphasis added.)

[¶13]   Ms. Vandom designated Dr. Woodruff as her medical expert in the contested case hearing. He was expected to testify by deposition that her ongoing medical conditions were causally related to her workplace injury. We discuss Dr. Woodruff's testimony in some detail because the deposition did not proceed as expected.

[¶14]   Dr. Woodruff was asked to opine whether Ms. Vandom's carpal tunnel (wrist) and cubital tunnel (elbow) were causally related to the September work injury, and he eventually responded: "I would have to say that I couldn't give a definitive answer one way or the other." The Division's counsel then asked him questions about the medical records from the September 5, 2020 emergency room visit. After reviewing the emergency room report for the first time, Dr. Woodruff agreed that in that report the patient denied having neck pain and reported only a back injury.

[¶15]  The Division's counsel then asked Dr. Woodruff what he knew about Ms. Vandom's September 12 motorcycle accident. After checking his notes, Dr. Woodruff testified he did not realize it was a motorcycle as opposed to a bicycle accident. He went on to say the intake paperwork did not reference the accident but only described a work injury. Dr. Woodruff agreed that his evaluation and treatment featured Ms. Vandom's cervical spine. The MRI taken October 21, 2020, showed degenerative changes in her cervical spine—"chronic stuff"—but nothing to indicate a recent injury. The following exchange then took place:

> Q.    Do you think that what is shown on the MRI of her cervical spine . . . was caused by the workplace injury on September 4, 2020?

A.    In light of this new information, I would have to say that there is definitely doubt in my mind that it is.  The findings on the MRI certainly look like they would pre-exist an injury and look more chronic than that.  Specifically, the patient had what's called myelomalacia, which is kind of a fancy word for scarring in the spinal cord, which would be a more chronic finding compared to something . . . that would be six weeks from her work injury.

So I think given the fact that she was seen the day after her accident and did not complain of any neck pain at that time and only started complaining of other symptoms and she had a motorcycle accident in the interim, I would be suspicious that [the] motorcycle accident was a more likely cause of her neck problems.

During the remainder of the direct examination, Dr. Woodruff continued to opine he no longer believed the cervical spine was causally connected to the incident on September 4, 2020.

[¶16]  On cross-examination, Dr. Woodruff drifted back to his original opinion.  After having Dr. Woodruff read Ms. Vandom's June 2021 interrogatory statement describing her physical reaction to the workplace incident, her counsel asked Dr. Woodruff if her cervicalgia/neck pain[4] was caused by the work injury.  He responded:

A.    I would say based on that answer, the way that's described, it's different than it had been described to me in the past.  Previously it was described as a pain where she felt a pop in her back.  This makes it sound like the pain originated in her neck and then down her arms and down her back.  So based on that history, it sounds more like a cervical problem rather than a lumbar problem from that work injury on September 4, 2020.

.    .    .

Q.    [A]re we back to where we started, that [her] neck and really the treatment you were giving [her] on [her] neck, is it

---

[4] "Neck pain, sometimes called cervicalgia, is pain in or around your spine beneath your head.  Your neck is also known as your cervical spine.  Neck pain is a common symptom of many different injuries and medical conditions."  Cleveland Clinic, *Neck Pain*, https://my.clevelandclinic.org/health/symptoms/21179-neck-pain (last visited May 24, 2023).

related to September 4, 2020, based on a reasonable degree of medical probability?

A. So there's been a lot of new information presented in these exhibits. Based on what's been presented and the new description of how her pain was experienced at the time of [her] injury, I do believe that the neck was likely injured in the workplace accident on September 4, 2020.

[¶17] On redirect, Dr. Woodruff conceded he had not seen any report of neck pain until October 28, 2020. He acknowledged that Ms. Vandom's interrogatory description was inconsistent with her previous accounts of her pain at the time of her injury. Dr. Woodruff also conceded these inconsistencies "raise[] doubt[s]" about the cause of injury. The following questions and answers on redirect completed the deposition:

Q. I think there's actually three possibilities here, that one, the September 4, 2020 workplace injury caused an injury to Ms. Vandom's spine as well; two, that it did not cause a cervical spine injury to her neck; three, you can't state within a reasonable degree of medical probability one way or the other. Do you understand those possibilities?

A. I do.

Q. And which one would you choose?

A. I think there's been too much back and forth and inconsistencies, so I would have to say that I can't state within a reasonable degree of . . . [m]edical probability. Falling back on the fact that she had not . . . described her symptoms the way she did until 2021 as coming from the neck and rather seemed to focus on the lower back as the problem, I would have to say that within a reasonable degree of medical probability that it was more likely that the motorcycle accident, rather than the workplace accident, caused the injury . . . .

Q. So in order to make sure that I nail this down in my mind, . . . you started before our deposition stating in medical records that you thought that her neck was related to the September 4, 2020, injury. . . .

A. Correct.

6

Q. And then after I . . . did my direct examination of you in this deposition, you changed your opinion and you said, no, I don't think the cervical spine is related to September 4, 2020; is that correct?

A. Correct.

Q. Then [Ms. Vandom's counsel] started cross-examining you and then you switched back again; is that correct?

A. Correct.

Q. And now I've done redirect examination and we've discussed some things further and put things in a perspective about the medical records, and now you've changed your opinion back, the cervical spine is not related to September 4, 2020, correct?

A. Correct.

Q. And all of your opinions were given within a reasonable degree of medical probability, true?

A. Of the information that I had at the time of answering it, yes.

[¶18] Ms. Vandom was the only witness who testified at the contested case hearing. Her description of her pain at the time of the injury conformed to her description in her interrogatory. She testified she had never had medical treatment for her neck prior to September 4, 2020. She testified that she had consistently described her pain as shooting up her arms and then down her back to the lumbar region, and that she had told her supervisor about the additional pain but "it was something [Ms. Vandom] felt [her supervisor] left out" when transcribing the written report.

[¶19] When asked why her neck was not mentioned in the emergency room records, she first explained: "I think with that, when I consider my back, that literally runs from my shoulders down. And then it's—with the side of the body would be like lower back. So I assumed that was like additional." Later, she was asked: "It says [in the emergency room record] your complaint was—at least initially was a bilateral hip pain work injury from yesterday. Is that what you told them, a bilateral hip pain work injury from yesterday?" Ms. Vandom responded, "No, sir." "They actually asked me to explain what I was doing and then the pain that I felt. And so the story that I had given you guys earlier, that's exactly what I had told them."

7

[¶20] Regarding her report of her pain to Dr. Woodruff on September 15, 2020, Ms. Vandom testified she had reported neck pain and pain throughout her body even though it was not written in his notes. Ms. Vandom agreed that when she saw Dr. Nieves, she reported she had no neck pain and she did not mark the patient body diagram to indicate pain in the neck and shoulder region.

[¶21] The OAH issued a decision on January 19, 2022. The decision confirmed Ms. Vandom's lumbar injury on September 4, 2020, but concluded Ms. Vandom failed to demonstrate any medical evidence that her cervical spine, carpal tunnel, and cubital tunnel injuries were causally related to this injury. Ms. Vandom appealed the decision to the district court. The district court affirmed. Ms. Vandom then timely appealed to this Court.

## *STANDARD OF REVIEW*

[¶22] We review the appeal of an administrative action "as if it had come directly from the agency, giving no deference to the district court's decision." *Mirich v. State ex rel. Bd. of Trs. of Laramie Cnty. Sch. Dist. Two*, 2021 WY 32, ¶ 15, 481 P.3d 627, 632 (Wyo. 2021) (quoting *Sweetwater Cnty. Sch. Dist. No. One v. Goetz*, 2017 WY 91, ¶ 23, 399 P.3d 1231, 1235 (Wyo. 2017)). The Wyoming Administrative Procedure Act, § 16-3-114(c) governs our review of the agency's decision.[5]

[¶23] "A workers' compensation claimant must prove all essential elements of her claim by a preponderance of the evidence." *Boylen v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2022 WY 39, ¶ 8, 506 P.3d 765, 769 (Wyo. 2022) (citation omitted).

---

[5]  (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

.   .   .

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
(B) Contrary to constitutional right, power, privilege or immunity;
(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
(D) Without observance of procedure required by law; or
(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2021).

Where, as here, both parties submit evidence, we apply the substantial evidence test to fact findings. And when reviewing an agency's decision that a claimant did not satisfy her burden of proof,

> we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Id.* (internal citations omitted) (quoting *Matter of Claim of Hood*, 2016 WY 104, ¶ 14, 382 P.3d 772, 776 (Wyo. 2016)).

### *DISCUSSION*

[¶24] Ms. Vandom claims the OAH lacked substantial evidence on which to base its decision. She points to the evidence that she had never sought medical treatment for her neck or numbness in her fingers prior to her workplace accident and that the hearing examiner did not give enough consideration to Dr. Woodruff's testimony that reports of injuries may be focused on an area of immediate pain rather than describing pain to all affected body parts. She also points to Dr. Woodruff's diagnosis of "cervicalgia" on September 15, 2020.

[¶25] In the absence of any medical testimony supporting her position, Ms. Vandom cites to our cases recognizing that medical testimony is not always necessary to establish a causal relationship to a workplace injury. These cases are inapposite because they require facts showing a single injury or an "exceedingly obvious" causation from that injury. *Matter of Claim of Rogers v. Russell Constr. Co., Inc.*, 2016 WY 80, ¶ 16, 376 P.3d 1172, 1175 (Wyo. 2016) ("Except in exceedingly obvious cases, proof of causation requires expert testimony to a reasonable degree of medical probability that a workplace event materially contributed to the precipitation, aggravation, or acceleration of the bodily damage for which compensation is sought—i.e., that it more probably than not had that effect." (citation omitted)); *Matter of Lysne*, 2018 WY 107, ¶¶ 16, 18, 426 P.3d 290, 295–

96 (Wyo. 2018) ("Proof of causation by a medical provider is not required in 'exceedingly obvious cases' such as when a single incident is alleged to have caused the injury. . . . We have required medical evidence to establish causation when a significant amount of time elapses between the initial workplace injury and the claim, when there is an intervening injury, when there is a preexisting condition, or when the claimant's symptoms and medical history are complex.").

[¶26] Here, there were two incidents—the September 4 workplace injury and the September 12 motorcycle accident—and Ms. Vandom's medical records contain evidence of a preexisting condition. Medical evidence was necessary to establish causation. In this case, both medical experts testified that a causal relationship could not be established to a reasonable medical probability between Ms. Vandom's cervical complaints and her work injury. There was substantial evidence supporting the hearing examiner's decision that Ms. Vandom's cervical spine, carpal tunnel, and cubital tunnel injuries were not causally related to her workplace injury.

[¶27] Ms. Vandom also claims the OAH decision is arbitrary and capricious. This claim is inapplicable under these facts.

> The arbitrary and capricious standard is available "as a 'safety net' to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard." *In re Claim of Hood*, 2016 WY 104, ¶ 15, 382 P.3d at 776 (quoting *Dale* [*v. S & S Builders, LLC*], 2008 WY 84, ¶ 23, 188 P.3d [554, 561 (Wyo. 2008)]). "The arbitrary and capricious standard applies if the agency failed to admit testimony or other evidence that was clearly admissible, or failed to provide appropriate findings of fact or conclusions of law." *Jacobs* [*v. State, ex rel., Wyo. Workers' Safety & Comp. Div.*], 2013 WY 62, ¶ 9, 301 P.3d [137, 141 (Wyo. 2013)]. Mr. Baker, however, does not argue that the Commission failed to admit testimony or other evidence that was clearly admissible. Mr. Baker's arguments rely exclusively upon record evidence. As a result, the arbitrary and capricious standard is inapplicable. *Id.*; *see also Rogers*, 2016 WY 80, ¶ 17, 376 P.3d at 1175.

*Baker v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2017 WY 60, ¶ 16, 395 P.3d 1095, 1101 (Wyo. 2017).

[¶28] Affirmed.