# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 140

OCTOBER TERM, A.D. 2013

November 8, 2013

IN THE MATTER OF THE WORKER'S
COMPENSATION CLAIM OF:

ALLEN TRUMP,

Appellant
(Petitioner),

v.

No. S-13-0071

STATE OF WYOMING, ex rel., WYOMING
WORKERS' SAFETY AND COMPENSATION
DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Laramie County*
*The Honorable Peter G. Arnold, Judge*

*Representing Appellant:*

　　*Robert A. Nicholas, Nicholas Law Office, Cheyenne, Wyoming.*

*Representing Appellee:*

　　*Gregory A. Phillips, Attorney General; John D. Rossetti, Deputy Attorney*
　　*General; Michael J. Finn, Senior Assistant Attorney General; Peter Howard,*
　　*Student Intern.*

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*



**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BURKE, Justice.**

[¶1]    The Wyoming Workers' Safety and Compensation Division awarded benefits to Appellant, Allen Trump, after he experienced a workplace injury to his knees in 1993.  In 2009, Mr. Trump sought payment for a left knee arthroscopy that he claimed was related to his workplace injury.  The Division denied the claim.  Mr. Trump requested a contested case hearing, and the hearing examiner upheld the Division's decision to deny benefits.  Mr. Trump appealed to the district court, which affirmed the hearing examiner's order.  He challenges the district court's decision in this appeal.  We affirm.

## ISSUES

[¶2]   Mr. Trump presents the following issues:

> 1.  Is the OAH's decision supported by substantial evidence?
>
> 2.  Did the OAH abuse its discretion in excluding hearsay testimony from Mr. Trump regarding the medical opinion of his treating physician?

## FACTS

[¶3]    Mr. Trump experienced a workplace injury on August 11, 1993 while working on a sewer excavation project for his employer, Mendez Excavation.  According to his initial report of injury, Mr. Trump injured his "leg [and] knee" when he stood up from a squatting position he had held in order to set a cover for a sewer pipe.  He was taken to the hospital after the incident for "right knee pain," where he reported that when he stood up, he "heard [his knee] pop, more on the right than the left."  In the emergency room, Mr. Trump was seen by Dr. Thomas J. Gasser, who placed him on crutches and advised him to keep his knee immobilized.

[¶4]    Three weeks later, Dr. Gasser ordered an MRI of the right knee, which revealed a tear in Mr. Trump's medial meniscus.  Dr. Gasser performed a right knee arthroscopy and partial medial meniscectomy on September 21, 1993.  However, Mr. Trump continued to experience pain in his right knee after surgery.  After attempting to treat the pain with oral anti-inflammatories and a steroid injection, Mr. Trump elected to have a second right knee arthroscopy on February 7, 1994.

[¶5]    In January, 1994, approximately three months after his initial right knee surgery, Mr. Trump filed a second report of injury indicating that when he injured his right knee, he also experienced pain in his left knee.  Three months later, in April, 1994, Dr. Gasser ordered an MRI of Mr. Trump's left knee, which revealed a medial meniscus tear.  The

1

MRI report also stated that "No meniscal displacement is evident and there is preservation of meniscal height." Dr. Gasser performed a left knee arthroscopy and partial medial meniscectomy on May 9, 1994.

[¶6]    At a follow-up visit with Dr. Gasser on May 26, 1994, Mr. Trump reported that his left knee was doing well and was causing him only a small amount of pain, but that his right knee continued to bother him. Mr. Trump began a physical therapy program in July, and the strength and flexibility of his left knee showed immediate and continued improvement through the summer and fall of 1994. A physical therapy report from late July noted that Mr. Trump "reports left knee is feeling good," but that he "complains of right knee pain, popping and grinding." Similarly, in September, Mr. Trump's physical therapist reported that his "left knee is feeling a lot better," but that "[h]e continues to have a lot of right knee pain."

[¶7]    Mr. Trump continued to see Dr. Gasser during the fall of 1994. The notes from those visits reveal that Mr. Trump had consistent right knee pain, but they make no mention of his left knee. Due to the continuing problems with Mr. Trump's right knee, Dr. Gasser performed a third arthroscopy and partial medial meniscectomy on the right knee in September, 1994. During a follow-up visit in December, Dr. Gasser noted that Mr. Trump's knees were "working quite well," but indicated that Mr. Trump would benefit from weight loss.

[¶8]    Dr. Gasser continued to see Mr. Trump on a monthly, and sometimes bi-monthly, basis during the first six months of 1995. During this period, Mr. Trump reported pain in both knees, and sometimes reported that his right knee hurt worse than the left. Dr. Gasser treated Mr. Trump's pain using various combinations of prescription and over-the-counter anti-inflammatory medications, and provided Mr. Trump with braces to wear on both knees. In July, 1995, Dr. Gasser sent a letter to the Division stating that Mr. Trump was "at a stable situation and therefore has probably reached [maximum medical improvement]. I will rate him for this if you wish." In a treatment note from July, 1995, Dr. Gasser assigned a 10% impairment rating to Mr. Trump's left knee. Following an examination in December, 1995, Dr. Gasser reported that "Patient's knees are working well. Both patellas are tracking well. He is not wearing his braces anymore. He is really quite comfortable. The knees occasionally pop[] still but he doesn't have much pain when they do."

[¶9]    Mr. Trump saw Dr. Gasser for routine examinations at approximately three month intervals during 1996 and 1997. Dr. Gasser consistently noted that Mr. Trump's knees were "moving" and "working" well. However, Dr. Gasser's notes during this period also reveal that Mr. Trump was "still having some knee pain on occasion," which he was able to control by limiting his activity. Dr. Gasser's notes reflect that Mr. Trump was also experiencing shoulder and chest pain. Throughout 1996 and 1997, Dr. Gasser instructed

Mr. Trump to treat his pain as needed with Orudis, which at that time was an over-the-counter non-steroidal anti-inflammatory drug.

[¶10]  After 1997, Dr. Gasser saw Mr. Trump on four occasions at irregular intervals.  In April, 1998, Dr. Gasser noted that Mr. Trump stopped taking Orudis because it was causing stomach pain and that he began having shoulder and knee pain as a result. Dr. Gasser also noted, however, that "The knees track well.  There is no effusion in either one.  Cruciate and collateral ligaments are intact to stress."  Dr. Gasser prescribed Arthrotec as a substitute for Orudis that would be gentler on Mr. Trump's stomach.  In August, 1998, Dr. Gasser noted that the Arthrotec was "controlling [Mr. Trump's] knee pain very nicely," and he instructed Mr. Trump to continue taking it as needed.  In the "Objective" section of his notes, Dr. Gasser stated that "Neither knee is swollen today. He is moving well.  He is walking well without limp."  Following Mr. Trump's next visit, in December, 1999, Dr. Gasser noted that "The knee is not swollen.  It moves smoothly without significant crepitation.  There is no effusion and no joint line tenderness." Similarly, after Dr. Gasser's last examination of Mr. Trump, in July, 2001, he noted that "His knee is working very well today. . . . It moves smoothly and without crepitation." Although Dr. Gasser's notes from the 1999 and 2001 examinations indicate that Mr. Trump continued to take Arthrotec, those notes refer only to Mr. Trump's "knee," without specifying which knee had been examined.

[¶11]  In July, 2002, Mr. Trump sought treatment from Dr. Meade Davis for pain in his right knee, which had been hurting him for about ten days.  Dr. Davis ordered an MRI of the right knee, which revealed a medial meniscus tear.  Dr. Davis subsequently performed right knee arthroscopies on Mr. Trump in August, 2002 and February, 2003.  Three weeks after his fifth right knee surgery, in February, 2003, Mr. Trump submitted to a comprehensive physical examination. Notes from that exam indicate that Mr. Trump was obese and that he smoked a pack of cigarettes per day.  The examining physician stated that Mr. Trump "needs to lose weight and needs to stop smoking" and that "Smoking cessation and dietary restriction with weight loss should be the next thing on his agenda."

[¶12]  In August, 2003, Dr. Davis wrote a letter to the Division stating that Mr. Trump had reached maximum medical improvement in his right knee and concluded that Mr. Trump had a 27% total impairment to his right knee.  In April, 2004, after Mr. Trump complained of intense pain in his right knee, Dr. Davis ordered an MRI, which revealed a complete tear in Mr. Trump's anterior cruciate ligament (ACL).  Mr. Trump, however, opted not to undergo another surgery at that time.  There is no indication in the record that Mr. Trump sought any treatment for his left knee from Dr. Davis.

[¶13]  In June, 2004, Mr. Trump began seeing Dr. Pete Kuhn to treat the tear in his right ACL.  Although Dr. Kuhn's notes indicate that Mr. Trump initially presented with an "ACL minus left knee," Dr. Kuhn later clarified that he had intended to refer to

Mr. Trump's right ACL. Similarly, after an examination in September, 2004, Dr. Kuhn wrote "Left knee follow-up but also right knee arthritis," but he later acknowledged that he had reversed the references to Mr. Trump's knees in his dictation. Dr. Kuhn surgically repaired Mr. Trump's right ACL in July, 2006. During a follow-up visit in December, 2006, in addition to discussing the condition of Mr. Trump's right knee, Dr. Kuhn noted that Mr. Trump was experiencing "medial joint line pain on the left knee." However, no treatment plan with respect to the left knee was discussed. Approximately one month later, in January, 2007, Dr. Kuhn performed a second operation on Mr. Trump's right knee to remove a screw that had been used to reconstruct the ACL. The record indicates that Mr. Trump did not see Dr. Kuhn again until May, 2008. Dr. Kuhn's notes from that visit indicate that Mr. Trump was experiencing instability and grinding in his right knee. There is no mention of Mr. Trump's left knee.

[¶14] On July 28, 2009, over a year after his previous office visit, Mr. Trump sought treatment from Dr. Kuhn for pain in his left knee, the condition at issue in this case. Dr. Kuhn requested preauthorization from the Division to perform an arthroscopy on Mr. Trump's left knee. In response to Dr. Kuhn's request, the Division asked Dr. Mark Rangitsch for an independent medical evaluation to determine whether there was a causal connection between Mr. Trump's left knee pain and his 1993 workplace injury. After setting forth Mr. Trump's medical history and the results of his physical examination, Dr. Rangitsch provided the following evaluation:

> At this point, I feel the patient does have an internal derangement to his left knee with likely a medial meniscus tear. In addition, he may have some chondromalacia in the knee, probably of the medial femoral condyle. As to any specific relation of the current left knee problems to an injury on August 11, 1993, this would be total conjecture. The fact that the patient has not had treatment for this for greater than 14 years, it is my opinion that it is highly unlikely that the current left knee problems are directly related to his injury back in 1993, therefore, I would not pre-authoriz[e] a left knee arthroscopy.

The Division issued a final determination on November 4, 2009, denying benefits relating to treatment of Mr. Trump's left knee.

[¶15] Mr. Trump objected to the Division's final determination and requested a contested case hearing before the Office of Administrative Hearings (OAH). Prior to the hearing, Mr. Trump sought a second opinion from Dr. Jay Carson. In his initial assessment, Dr. Carson noted that Mr. Trump had "Progressive left knee arthritis, likely traumatic in nature," and that "This could be associated with his Workers' Comp injury,

4

but secondary to the long time differential, it is difficult to make that direct association." Mr. Trump requested that his care be transferred to Dr. Carson, despite Dr. Carson's recommendation that he continue to follow-up with Dr. Kuhn. In a subsequent assessment, Dr. Carson noted that Mr. Trump reported that he had undergone "at least" two surgeries on his left knee. Dr. Carson ordered an MRI of Mr. Trump's left knee, which revealed a "posterior horn tear of the medial meniscus." Despite Dr. Carson's opinion that there were "significant limitations" to relieving Mr. Trump's pain through surgical intervention, and that surgery would not "fix" his left knee issues, Mr. Trump asked Dr. Carson to perform a left-knee arthroscopy. Dr. Carson proceeded with the arthroscopy on September 3, 2010.[1]

[¶16] Mr. Trump's contested case hearing was held on March 17, 2011. The hearing examiner received documentary evidence relating to Mr. Trump's medical history, as well as the deposition testimony of Drs. Kuhn and Rangitsch, and testimony from Mr. Trump. Following the hearing, the OAH issued an order concluding that Mr. Trump "did not prove, by a preponderance of the evidence, his left knee injury and symptoms treated by Dr. Kuhn and Dr. Carson, were caused by or related to his August 11, 1993, work related accident." Importantly, the hearing examiner found Dr. Rangitsch's testimony to be more persuasive than Dr. Kuhn's testimony. Mr. Trump filed a petition for judicial review in district court and the district court affirmed. Mr. Trump filed a timely appeal from the district court's decision. Additional facts will be presented as

---

[1] Although Dr. Carson stated that an arthroscopy would not "fix" Mr. Trump's knee pain, the Division did not raise the issue of whether the procedure was "medically necessary." We recently explained the meaning of "medically necessary" treatment in *In re Beall*, 2012 WY 38, ¶ 22, 271 P.3d 1022, 1032 (Wyo. 2012):

> One of the benefits provided by the Worker's Compensation Act is payment of medical expenses for work-related injuries. "The expense of medical and hospital care of an injured employee shall be paid from the date of the compensable injury . . . ." Wyo. Stat. Ann. § 27-14-401(a). As indicated in the definition of "medical and hospital care," however, medical care must be reasonable and necessary in order for an expense to be covered by the Act: "'Medical and hospital care' when provided by a health care provider means any reasonable and necessary first aid, medical, surgical or hospital service . . . ." Wyo. Stat. Ann. § 27-14-102(a)(xii). The Rules and Regulations of the Workers' Compensation Division provide further guidance as to the meaning of the phrase "medically necessary": "'Medically necessary treatment' means those health services for a compensable injury that are reasonable and necessary for the diagnosis and cure or significant relief of a condition consistent with any applicable treatment parameter." Rules, Regulations and Fee Schedules of the Wyoming Workers' Safety and Compensation Division, Ch. 1, § 4(al).

necessary in the discussion below.

## *STANDARD OF REVIEW*

[¶17] Review of an administrative agency's action is governed by the Wyoming Administrative Procedure Act, which provides that:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> . . .
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
>> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>>
>> (B) Contrary to constitutional right, power, privilege or immunity;
>>
>> (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
>>
>> (D) Without observance of procedure required by law; or
>>
>> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2009). We review an administrative agency's findings of fact pursuant to the substantial evidence test. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.*, ¶ 11, 188 P.3d at 558. Findings of fact are supported by substantial

6

evidence if, from the evidence in the record, this Court can discern a rational premise for the agency's findings. *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 118, ¶ 11, 259 P.3d 1161, 1164 (Wyo. 2011).

[¶18]   Where the hearing examiner determines that the burdened party failed to meet his burden of proof, we must decide whether that determination was contrary to the overwhelming weight of the evidence. *Leavitt v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 95, ¶ 18, 307 P.3d 835, 840 (Wyo. 2013).  We defer to the hearing examiner's determination of witness credibility unless it is clearly contrary to the overwhelming weight of the evidence. *Id.*

[¶19]   With respect to the standard of review applied to questions of admissibility of evidence in administrative proceedings, we have stated that "Admissibility of evidence is committed to the discretion of the hearing examiner. A hearing examiner abuses his discretion when his decision shocks the conscience of the court and appears to be so unfair and inequitable that a reasonable person could not abide it." *Morris v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 71, ¶ 28, 276 P.3d 399, 406 (Wyo. 2012).

## *DISCUSSION*

### I.   Substantial Evidence

[¶20]   In Mr. Trump's first issue, he contends the hearing examiner's conclusion that there was no causal connection between Mr. Trump's 1993 workplace injury and his 2009 left knee pain is not supported by substantial evidence.   He asserts that Dr. Rangitsch's opinion that there was no causal relationship is unreliable because it rests on the false premise that Mr. Trump received no treatment for his left knee between 1994 and 2009.   Mr. Trump claims the evidence demonstrated that he "received continuing treatment for his left knee from 1993 to 1998 and from 1999 to 2004 and thereafter."  He also claims the hearing examiner ignored "undisputed" evidence that "Mr. Trump continued to use a knee brace on his left knee, including between 1999 and 2004 and thereafter."   Finally, Mr. Trump contends there was no evidentiary support for the hearing examiner's conclusion that "the left knee injury and accident suffered by Trump on August 11, 1993, was not one which one would expect to be causally connected to a left knee condition diagnosed and treated 16 years later."

[¶21]   A claimant in a worker's compensation case has the burden of proving all of the elements of the claim by a preponderance of the evidence. *Mitcheson v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 74, ¶ 11, 277 P.3d 725, 730 (Wyo. 2012). As part of that burden, the claimant must prove a causal connection exists between a work-related injury and the injury for which workers' compensation benefits are sought. *Id.*  A preponderance of the evidence is "proof which leads the trier of fact to find that the

existence of the contested fact is more probable than its non-existence." *Id*. (quoting *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 22, 247 P.3d 845, 851 (Wyo. 2011)).  It is undisputed that Mr. Trump experienced a compensable injury to his left knee in August, 1993. However, Mr. Trump also had the burden to prove, by a preponderance of the evidence, that his 2009 left knee pain was causally related to his workplace injury.[2]

[¶22]  As we have previously stated,

> "[T]he causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation or acceleration of the injury. We do not invoke a standard of reasonable medical certainty with respect to such causal connection. Testimony by the medical expert to the effect that the injury 'most likely,' 'contributed to,' or 'probably' is the product of the workplace suffices under our established standard . . . .
>
> [U]nder either the 'reasonable medical probability' or 'more probable than not' standard, [a claimant succeeds] in demonstrating the causal connection by a preponderance of the evidence."

*Anastos v. Gen. Chem. Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 666 (Wyo. 2005) (quoting *Hall v. State ex rel. Wyoming Workers' Compensation Div.*, 2001 WY 136, ¶ 16, 37 P.3d 373, 378 (Wyo. 2001)).  However, where there is conflicting expert testimony with respect to causation, as in the present case, the hearing examiner must determine the

---

[2] In the proceedings below, the OAH also denied Mr. Trump's claim for benefits under the second compensable injury rule even though that claim had not been specifically asserted. The "second compensable injury" rule applies "when an initial compensable injury ripens into a condition requiring additional medical intervention." *Hoffman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 164, ¶ 9, 291 P.3d 297, 301 (Wyo. 2012) (quoting *Rogers v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 117, ¶ 14, 284 P.3d 815, 819 (Wyo. 2012)).  "Under the second compensable injury rule, a subsequent injury or condition is compensable if it is causally related to the initial compensable injury." *Hoffman*, ¶ 9, 291 P.3d at 301.  We have noted that "the burden of proof for a second compensable injury is no different than the burden applied to all claimants to show the causal connection between their injuries and their work." *Kenyon*, ¶ 22, 247 P.3d at 852. Accordingly, Mr. Trump's burden of proof with respect to causation remained the same regardless of whether the second compensable injury rule was applied.  He does not address the second compensable injury rule in this appeal.

relative weight to be accorded to each expert's testimony:

> When conflicting medical opinions are presented at the contested case hearing, the agency has the
>
>> responsibility, as the trier of fact, to determine relevancy, assign probative value, and ascribe the relevant weight given to the evidence presented. *Clark v. State ex rel. Wyoming Workers' Safety & Compensation Div.*, 934 P.2d 1269, 1271 (Wyo. 1997). The [agency] is in the best position to judge and weigh medical evidence and may disregard an expert opinion if it finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based. *Id.*; *Matter of Goddard*, 914 P.2d 1233, 1238 (Wyo.1996).
>
>> *Spletzer v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 90, ¶ 21, 116 P.3d 1103, 1112 (Wyo. 2005). We do not re-weigh the evidence, but defer to the agency's decision so long as it is based on relevant evidence that a reasonable mind might accept as supporting that decision. *Id.*, ¶ 22, 116 P.3d at 1112.

*Hayes v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 96, ¶ 16, 307 P.3d 843, 849 (Wyo. 2013).

[¶23] Mr. Trump's claim that the hearing examiner's decision was not supported by substantial evidence is based, in large part, on the assertion that the hearing examiner did not properly weigh the expert testimony presented at the contested case hearing. He contends that both the hearing examiner and Dr. Rangitsch misapprehended the frequency and extent of treatment for his left knee between the time of his left knee surgery, in 1994, and his complaints of left knee pain in 2009. He contends the hearing examiner's reliance on Dr. Rangitsch's opinion was misplaced because Dr. Rangitsch ignored the fact that he had reported left knee pain and received treatment on a consistent basis between 1994 and 2009. Contrary to the hearing examiner's findings, Mr. Trump claims that he had "continual treatment, including pharmaceutical treatments, for his left knee between 1994 and 2009" and that it is "undisputed" that he "continued to use a knee brace on his left knee, including between 1999 and 2004 and thereafter." Our review of the record, however, reveals only a few instances, separated by significant intervals, in which Mr. Trump reported left knee pain following his 1994 surgery and rehabilitation.

9

[¶24]   While the evidence contained in the record does indicate that Mr. Trump reported left knee pain during 1997 and 1998 visits with Dr. Gasser, and during a 2006 examination by Dr. Kuhn, that evidence cannot be stretched to support Mr. Trump's assertion that he received "continuous" treatment for his left knee.  The examination notes generated by Mr. Trump's treatment with Dr. Gasser, from 1995 to 2001, frequently indicate that Mr. Trump was not experiencing pain in his knees, often fail to distinguish whether Mr. Trump was experiencing pain in his left or right knee, and indicate sources of pain other than Mr. Trump's knees for which anti-inflammatory medications were needed.  The ambiguity resulting from Dr. Gasser's failure to identify whether one or both knees were being treated is especially significant in light of Mr. Trump's medical history, which, even at this early stage, reflects a much greater emphasis on the condition and treatment of his right knee.  The next mention of left knee pain in the record is from a 2006 examination by Dr. Kuhn. However, there is no indication that any treatment was provided for Mr. Trump's left knee at that time.

[¶25]   Additionally, although Mr. Trump testified that, up to the date of the hearing, he had periodically worn braces on both of his knees when they were "not comfortable [] or hurting to walk on," there is no indication in Mr. Trump's medical records that he wore a brace on his left knee after 1995.   Indeed, in December, 1995, Dr. Gasser stated Mr. Trump was "not wearing his braces anymore," and his subsequent treatment notes do not indicate that Mr. Trump continued to wear a brace on his left knee.  Further, although Mr. Trump claims that Dr. Kuhn provided him with "wrap around knee braces" for both knees in June, 2004, after an MRI revealed a tear in Mr. Trump's right ACL, Dr. Kuhn's notes actually refer to Mr. Trump's "knee brace" in the singular, within the context of a discussion of Mr. Trump's right knee.  Accordingly, although Mr. Trump's medical records do not reflect a complete absence of treatment for his left knee, the record reveals that the treatment was not nearly as extensive as Mr. Trump suggests.

[¶26]   More importantly, however, despite the scattered references in the record to the use of anti-inflammatory medications to treat Mr. Trump's left knee pain, Dr. Rangitsch's statements indicate that this is not the kind of "treatment" he would have relied on to establish a causal connection considering the condition of Mr. Trump's left knee in 2009.  On September 30, 2010, Dr. Rangitsch wrote a letter to the Division responding to Dr. Kuhn's deposition testimony, which is discussed below.  In that letter, Dr. Rangitsch suggested that the lack of a causal connection between Mr. Trump's 1993 injury and his 2009 left knee pain was indicated by the absence of any surgical intervention over a 15-year interval:

> The patient had one procedure in 1994, and despite having multiple appointments and visits, as well as multiple procedures on his right knee, had no treatment for his left knee.  Therefore, the fact that he had an injury in 1993 and a

10

procedure in 1994, and now is requesting authorization for a surgery some fourteen to fifteen years later, there is no direct link. Therefore, I feel there is certainly some intervening interval, which would have caused the patient to require surgery, as the timeframe of fifteen years bodes that he did not have a continuing meniscal problem for fifteen years and he sought no medical treatment for this.

[¶27] Ultimately, however, even if we were persuaded by Mr. Trump's attempt to discredit the testimony of Dr. Rangitsch, we would still be unable to determine that the hearing examiner's decision was clearly contrary to the overwhelming weight of the evidence in light of the testimony of Dr. Kuhn, Mr. Trump's own expert. In his deposition, Dr. Kuhn stated that he believed Mr. Trump had traumatic arthritis as a result of his workplace injury. He also stated that Mr. Trump had a history of gout, which contributed to inflammatory arthritis in his knee. Dr. Kuhn explained that, in contrast to traumatic arthritis, the presence of inflammatory arthritis is "more developmental, genetic, [and depends on] how heavy a person is and how good their body is at metabolizing the proteins one takes in." When he saw Mr. Trump in July, 2009, he believed that Mr. Trump "had just flared up an abnormal knee," which, as he explained in his testimony, may have occurred spontaneously or may have been caused by "weather change, activity change, [or] a twist." Dr. Kuhn initially stated that he thought Mr. Trump's 2009 left knee pain was caused by his "longstanding arthritis," and that Mr. Trump's 1993 injury and 1994 surgery were "components" of his traumatic arthritis. Immediately after expressing this opinion, however, Dr. Kuhn stated that there was "a very strong possibility his knee's going to hurt just because he's heavy and he has gout."

[¶28] When Dr. Kuhn was asked, on direct examination, whether he could relate Mr. Trump's 2009 knee pain to his 1993 injury, Dr. Kuhn stated that he could not:

Q: Then as you – as you may know, the reason that we're having a hearing in this Workers' Compensation case is to determine whether or not the recommended outpatient arthroscopy that you have recommended is related in any way to the original 1993 injury and subsequent treatment that [Mr. Trump] had [on] his left knee after that. Do you have an opinion on that issue?

A: It's very difficult to say it was a majority. The symptoms that he had on July 28, 2009 were in majority due to the 1993 work injury. I'd have to tie it more to what I found on his right knee, where he presented with a joint full of blood and that. So I think it would be very difficult for me to give

11

majority, especially in light of the fact that I know he has hyperuricemia [gout].

Q: And when you say majority, are you saying that most – more than 50 percent of his treatment is for the pre[-]existing injury? What do you mean by majority?

A: ***Well, if I sit here today and say that the reason it was indicated for arthroscopy was more than a 50 percent chance due to the work injury of 1993, I don't have any basis for that.***

(Emphasis added.) Dr. Kuhn further stated that "My thought is I don't even know what his work injury was in 1993. I know that he reported an injury to both knees, but I don't know if he had blood in his knee or not. So it could have been a tweaking because he had gout."

[¶29] In response to hypothetical questions from Mr. Trump's counsel, which asked Dr. Kuhn to assume a "change of the course of the knee" resulting from Mr. Trump's 1993 injury and 1994 surgery, Dr. Kuhn stated that the resulting abnormality in the left knee would have contributed to his need for treatment in 2009. However, on cross-examination, Dr. Kuhn acknowledged that he knew "nothing" about the original mechanism of injury to Mr. Trump's left knee in 1993. After Dr. Kuhn was presented with Mr. Trump's original report of injury, as well as medical records relating to his 1994 surgery, he again stated that he could not say Mr. Trump's 2010 surgery was causally related to his 1993 injury:

Q: Doctor, knowing what you do now about the – well, about the mechanism of injury back in 1993, would it be fair to say that claimant's left knee condition at the time that you saw him cannot be related on a direct basis to the original work injury within a reasonable degree of medical probability?

. . .

A: It goes to what I said earlier, I don't – even with this information, I don't know that there was any internal derangement that day. There's no, you know, complaints, and there's no real findings. And then you have the pathology as the symptoms presented and the MRI was done. But the date of injury, I don't know that there was a major change in his anatomy with my review of this information for

12

the first time. I can't pinpoint a change in his anatomy equating an injury in my mind on the 1993 date.

Q: So just so I'm clear, you cannot state that it's more probable than not that this work incident and the injury resulting therefrom is the cause of his need for treatment in 2009?

A: On his left knee?

Q: Correct.

A: Yes.

Q: And that's all we're here about.

A: Yes.

Notwithstanding this admission, on re-direct examination, Dr. Kuhn stated that he disagreed with Dr. Rangitsch's statement that "it is highly unlikely [that Mr. Trump's] current left knee problems are directly related to his injury in 1993." However, when asked whether his disagreement with Dr. Rangitsch caused him to conclude that there was "a relation in some way or another to the 1993 injury and subsequent surgery," Dr. Kuhn noted that he had "concerns" based on Mr. Trump's 1993 knee symptoms, but stated that Mr. Trump's medical history was "complicated by the gout, which I think is real." Further, on re-cross examination, Dr. Kuhn stated that Mr. Trump would have the same problems with his knee if he hadn't experienced an injury in 1993 due, in part, to Mr. Trump's gout. When he was asked by Mr. Trump's counsel how he could say that Mr. Trump's condition would be "basically the same" if he had not injured himself in 1993, Dr. Kuhn stated:

> Because we don't know what's causing his pain, and he has terrible medical comorbidity. So whether or not he tore his cartilage in 1993, his knees are going to present today like they are, independent of injury, simply from the metabolic. And he's always been a patient that's had more pain than just the anatomic abnormality described on his MRI's, both right and left side. . . . He'd still have pain complaints because of his gout.

Dr. Kuhn also stated that the mechanism of Mr. Trump's 1993 injury would not normally result in a tear of the medial meniscus.

[¶30] On October 18, 2012, Dr. Kuhn provided a written response to Dr. Rangitsch's September, 2010 letter to the Division, which further explained Dr. Kuhn's opinions and deposition testimony. Dr. Kuhn set forth his conclusions as follows:

> As to the fact that he had an injury in 1993 and a procedure in 1994 requesting authorization for a surgery some 14-15 years later, there is no direct link. I think one has to look at his Workman's Compensation reports at that time to see what was documented. Obviously if there was work related injury at that time he would certainly have propagation of cartilage change thought to be meniscal, thought to be articular and then complicated by the fact that he systematically is getting knee pain from a metabolic direction, i.e. the gout. I think as far as his time frame and not having a continuing meniscal problem for 15 years is more related to the configuration of the tear. Certainly as he presented with activity of daily living and then internal derangement symptoms in the July of 2009 interval, it is well within probability that he would have delamination of the articular cartilage and/or propagation of any kind of meniscal pathology that then would have caused him to have significant symptoms and indicate the arthroscopy.
>
> In summary, I think once there is damage to cartilage in the knee there can be probability of symptoms from internal derangement from continuing breakdown of that cartilage either articular or meniscal and I think another sub-population we see this in are the athletes that don't necessarily have an acute injury but develop ongoing symptoms and then have interval arthroscopy to remove the abnormal cartilage and get a little settling down of the internal derangement symptoms and the function again on these knees.

After reviewing Dr. Kuhn's deposition testimony and the letter supplementing his testimony, the hearing examiner determined that Dr. Kuhn's opinions relating to causation "were not helpful because they were based upon an ambiguous understanding of the 1993 mechanism of injury, a confused understanding of which knee he was treating and because his stated opinions were equivocal and not strongly stated."

[¶31] In light of the evidence noted above, we agree with the hearing examiner's

conclusion that Dr. Kuhn's opinions were equivocal and not strongly stated. We note, however, that at least some of the opinions expressed by Dr. Kuhn during his deposition strongly suggest the absence of a causal connection between Mr. Trump's 1993 injury and his 2009 knee pain. Indeed, Mr. Trump's counsel seemed to acknowledge this fact during the deposition when, in response to an objection alleging that he had asked a leading question, he stated that a leading question was appropriate because Dr. Kuhn had "[b]ecome an adverse witness." Ultimately, however, we find the hearing examiner reasonably assigned greater weight to Dr. Rangitsch's testimony in light of the manner in which Dr. Kuhn repeatedly reversed and qualified his opinions. Consequently, we are unable to conclude that the hearing examiner's finding with respect to the lack of a causal connection between Mr. Trump's 1993 workplace injury and his 2009 left knee pain was contrary to the overwhelming weight of the evidence.

[¶32] Finally, we are not persuaded by Mr. Trump's claim that the hearing examiner inappropriately found that "the left knee injury and accident suffered by Trump on August 11, 1993, was not one which one would expect to be causally connected to a left knee condition diagnosed and treated 16 years later." To the extent Mr. Trump's argument is intended to suggest that causation could be established in the present case absent expert testimony, we do not agree. We recently noted in *Jacobs v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 62, ¶ 11 n.1, 301 P.3d 137, 142 n.1 (Wyo. 2013), that expert medical testimony is not always necessary to establish causation. Expert medical testimony may not be required where the medical condition complained of is "immediately and directly or naturally and probably" the result of the workplace incident. *Id.* (citing *Middlemass*, ¶ 34, 259 P.3d at 1169). In the present case, however, neither Dr. Rangitsch nor Dr. Kuhn suggested that Mr. Trump's 2009 meniscus tear was an expected or natural result of his 1993 injury. Rather, as noted by the hearing examiner, both experts testified that a torn meniscus typically results from acute trauma to the knee, such as forceful twisting or shearing. Additionally, the simple fact that nearly 16 years had elapsed between Mr. Trump's accident and the condition at issue in this case suggests the need for expert testimony in order to establish causation. For these reasons, we conclude that the hearing examiner's finding is supported by substantial evidence.

## II. Exclusion of Hearsay Testimony

[¶33] In his second issue, Mr. Trump challenges the hearing examiner's decision to exclude his proposed testimony regarding statements alleged to have been made by Dr. Carson. That testimony was excluded during the following exchange, which led to an offer of proof:

> Counsel for Petitioner: In your discussions with Dr. Carson, did you ask him if there was any relationship between the

problems that he did surgery on in 2010 as compared to the original injury in 1993?

Counsel for Division: We object to this line of questioning as an effort to bring in Dr. Carson's opinions. We have no idea what it would be based on. Dr. Carson is not here for us to cross-examine. And we don't consider it appropriate – an appropriate means to attempt to bring in medical causation evidence in this case.

Hearing Examiner: Any response, [Counsel for Petitioner]?

Counsel for Petitioner: Well, the hearsay rule is – is not applicable [in] this situation. And it's – if it's what his treating physician tells him, he has the right to testify about what his doctor told him. The Division has Dr. Carson's medical records. They had the opportunity to take Dr. Carson's deposition, and they didn't do it. And so I think we have the right to have him testify as to what his doctor told him.

Hearing Examiner: I'm going to sustain the objection. We have two doctors who testified by deposition. And while it may be of limited relevance, I think at this point it's so far afield that I'm going to sustain the objection.

Counsel for Petitioner: I would just, then, submit an offer of proof that had he testified, that he would have testified that Dr. Carson told him that there is a [correlation] -- or a relationship between the arthritis in his knee and the original injury, because the surgeries and the injury then led up to the degenerative process in his knee which has resulted in the tear and the need for the surgery. So I would just submit that as an offer of proof.

Hearing Examiner: That's fine. Thank you.

Mr. Trump contends the hearing examiner erred as a matter of law in excluding this testimony because the Wyoming Administrative Procedure Act "clearly allows for the admission of hearsay[,] and the opinion of the physician who actually performed the left knee surgery is relevant and material to the issue that was before the OAH." As noted above, we review a hearing examiner's decision regarding the admissibility of evidence

for an abuse of discretion.

[¶34] Wyo. Stat. Ann. § 16-3-108 (LexisNexis 2009) governs the admissibility of evidence in administrative proceedings. That statute provides, in pertinent part, as follows:

> **§ 16-3-108. Contested cases; admissible evidence; cross-examination; judicial notice.**
>
> (a) In contested cases irrelevant, immaterial or unduly repetitious evidence shall be excluded and no sanction shall be imposed or order issued except upon consideration of the whole record or such portion thereof as may be cited by any party and unless supported by the type of evidence commonly relied upon by reasonably prudent men in the conduct of their serious affairs. Agencies shall give effect to the rules of privilege recognized by law. Subject to these requirements and agency rule if the interests of the parties will not be prejudiced substantially testimony may be received in written form subject to the right of cross-examination as provided in subsection (c) of this section.
>
> (b) Documentary evidence may be received in the form of copies or excerpts, if the original is not readily available. Upon request, parties shall be given opportunity to compare the copy with the original.
>
> (c) A party may conduct cross-examinations required for a full and true disclosure of the facts and a party is entitled to confront all opposing witnesses.
> . . .

We have said that hearsay is admissible in administrative proceedings when it satisfies the requirements of Wyo. Stat. Ann. § 16-3-108 and it is "probative, trustworthy and credible."

> [A]dministrative agencies acting in a judicial or quasi judicial capacity are not bound by technical rules of evidence that govern trials by courts or juries, and it is usually held that evidence will not be excluded merely because it is hearsay. Where hearsay evidence is by statute admissible in administrative proceedings, it is often held that it must be

17

probative, trustworthy and credible; and, although it may not be the sole basis for establishing an essential fact and is insufficient to support an administrative decision, it may be considered as corroborative of facts otherwise established.

*Watkins v. State ex rel. Wyo. Med. Comm'n & Wyo. Workers' Safety & Comp. Div.*, 2011 WY 49, ¶ 21, 250 P.3d 1082, 1089 (Wyo. 2011).

[¶35] We find a closely analogous ruling and argument presented in *Whaley v. Alaska Workers' Comp. Bd.*, 648 P.2d 955 (Alaska 1982). In that case, the Alaska Supreme Court considered whether the Alaska Workers' Compensation Board had erred in excluding the claimant's testimony regarding an alleged causal relationship between his original injury and a subsequently arising condition, as related to him by his physicians. Citing supporting authority from other jurisdictions, the Court concluded that the Board had not erred in excluding the claimant's hearsay testimony because the testimony was not trustworthy:

> Whaley reasons on appeal that the liberalization of the rules of evidence in hearings before the Board requires the Board to accept all hearsay evidence. The provisions cited above, however, do not contain such a requirement. The statute states that all relevant evidence, even if hearsay, "shall" be admitted in Board hearings provided it is evidence "responsible persons are accustomed to rely on in the conduct of serious affairs." AS 44.62.460(d). This language gives the board discretion to exclude hearsay evidence where it appears untrustworthy. *Reynolds Metals Co. v. Industrial Commission*, 98 Ariz. 97, 402 P.2d 414, 417-18 (Ariz. 1965); *Bergan v. Gallatin Valley Milling Co.*, 138 Mont. 27, 353 P.2d 320, 321 (Mont. 1960); see 3 Larson, *Workmen's Compensation Law* §§ 79.22-.23 (1976). Boards in other jurisdictions have thus excluded as untrustworthy testimony by a claimant regarding a discussion with a physician concerning the cause and extent of a medical condition. *Kelsey v. Industrial Commission*, 79 Ariz. 191, 286 P.2d 195, 198 (Ariz. 1955); *Pacific Employers Insurance Co. v. Industrial Accident Commission*, 47 Cal. App. 2d 494, 118 P.2d 334, 338 (Cal. Dist. Ct. App. 1941). Because Whaley's testimony on this subject could be considered untrustworthy for a number of reasons, including intentional fabrication, misunderstanding of the impact of the doctors' statements, or because the doctors' statements themselves were casual and

18

ill-considered, and because it did not corroborate direct evidence in the [doctors'] letters, the Board's exclusion of his hearsay testimony was not error.

*Id.*, 648 P.2d at 958 (emphasis omitted).

[¶36]   While we agree that Mr. Trump's hearsay testimony was relevant to the issue of causation, that testimony, for reasons similar to those stated in *Whaley*, was not helpful or trustworthy.   According to Mr. Trump's counsel, Mr. Trump would have testified that Dr. Carson told him his 2009 injury was related to the original workplace injury. However, following Mr. Trump's examination by Dr. Carson in July, 2010, Dr. Carson noted as follows:

> **ASSESSMENT/PLAN:** Progressive left knee arthritis, likely traumatic in nature. ***This could be associated with his Workers' Comp injury, but secondary to the long time differential, it is difficult to make that direct association.*** The patient feels like he would like to further work this up. We discussed options of treatment. He would like to proceed with an MRI with gadolinium and re-evaluate at that time. He is considering the possibility of another arthroscopy, which he brought up on his own, but we cautioned him that there are significant limitations with this, particularly in light of the previous surgeries and likely damage that is in the knee, but we will re-evaluate that in the coming 2 weeks.

(Emphasis added.)[3]   Mr. Trump's proposed testimony, as related by his counsel, would have contradicted Dr. Carson's written statements that the treatment sought "could be associated" with Mr. Trump's 1993 injury, but that "it is difficult to make that direct association."   Additionally, we note that Mr. Trump's hearsay testimony had limited probative value absent Dr. Carson's ability to explain the reasons supporting his alleged opinion.   In light of these concerns, we are unable to conclude that the exclusion of Mr. Trump's hearsay testimony was an abuse of discretion.

[¶37]   Affirmed.

---

[3] Dr. Carson's notes indicate that Mr. Trump told Dr. Carson that he had undergone more than one surgery on his left knee.  The record indicates that Mr. Trump had only one surgery, in 1994, on his left knee prior to the 2010 arthroscopy.