# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 39

**OCTOBER TERM, A.D. 2013**

*March 13, 2014*

IN THE MATTER OF THE WORKER'S
COMPENSATION CLAIM OF:

RICK D. BODILY,

Appellant
(Petitioner),

v.                                                                          S-13-0128

STATE OF WYOMING, ex rel.,
WYOMING WORKERS' SAFETY &
COMPENSATION DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Natrona County*
*The Honorable David B. Park, Judge*

*Representing Appellant:*
   Stephenson D. Emery of Williams, Porter, Day & Neville, P.C., Casper, WY

*Representing Appellee:*
   Peter K. Michael, Wyoming Attorney General; John D. Rossetti, Deputy Attorney
   General; Michael J. Finn, Senior Assistant Attorney General; and Jessica Y. Frint,
   Assistant Attorney General

*Before KITE, C.J., and HILL, VOIGT\*, BURKE, and DAVIS, JJ.*


*\*Justice Voigt retired effective January 3, 2014.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**HILL,** Justice.

[¶1]  Rick Bodily suffered work-related injuries to his back for which he received Worker's Compensation benefits in 1996 and 2004.  In 2008 and 2011, Bodily underwent surgeries to treat a herniated disc in his low back.  The Wyoming Workers' Compensation Division (Division) denied Bodily's application for benefits to cover the two surgeries and any other expenses after June 2005.  Bodily appealed, contending that the herniated disc in his low back was a direct result of his 1996 and 2004 injuries and was therefore a second compensable injury for which he was entitled to benefits.  The Office of Administrative Hearings (OAH) upheld the denial of benefits, and the district court affirmed.  Bodily appeals, claiming that the denial of benefits was contrary to the great weight of the evidence.  We affirm.

## ISSUE

[¶2]  Bodily states the issue on appeal as follows:

> Is the Office of Administrative Hearings' decision denying benefits clearly contrary to the great weight of evidence proving a causal connection between Bodily's 1996 and 2004 work injuries and his pain complaints after 2005 – and resulting surgeries in 2008 and 2011 – such that he suffered a second compensable injury?

## FACTS

[¶3]  On March 11, 1996, Bodily suffered a back injury while working for JTL Group in Casper, Wyoming.  Bodily's injury report described the injury as one to his middle back, and the emergency room report stated as follows concerning the injury:

> This is a 30-year-old white male, who while at work today, was lifting and turning to put a muffler onto a piece of heavy machinery.  In the course of lifting and twisting he began having pain in his midback region rather suddenly.  He denies any numbness or tingling anywhere but has significant muscle spasms in his back which are making him very uncomfortable.  He denies any prior history of problems with his back.  He denies any other areas of pain.

[¶4]  The emergency room report on Bodily's 1996 injury also noted that "[x]-ray evaluation of the thoracic spine appears unremarkable."  Bodily's 1996 injury was diagnosed as a midback strain, and he was prescribed medication, physical therapy, and

1

light duty. The Division paid all hospital, medication, and other treatment costs related to the 1996 incident.

[¶5]    On July 7, 2004, Bodily suffered another work-related injury to his back while working for JTL Group. This time the injury occurred when Bodily turned and twisted his back while carrying a box down a flight of stairs. Bodily described his 2004 injury as "lower back pain and right hip pain into the legs," and he saw a chiropractor for treatment. A radiological report for x-rays taken on July 9, 2004, reported a "[n]egative lumbar spine series" and included the following findings:

> Routine views of the lumbar spine demonstrate the disc spaces and vertebral bodies to be of normal height and alignment. No osteolytic or blastic lesions, spondylolysis, fracture or other osseous abnormalities are identified.

[¶6]    On November 18, 2004, the Division issued a Final Determination Opening Case for the 2004 back injury. The Division paid the medical expenses related to the 2004 injury, and Bodily continued to receive benefits until June 2, 2005.

[¶7]    Thereafter, Bodily sought treatment on a number of occasions for back pain that was either unrelated to his work at JTL Group or unrelated to work. In October 2005, Bodily sought treatment for back pain he experienced while pushing a vehicle that was parked where Bodily's employer was doing asphalt work. Bodily was working for Ramshorn Construction at that time and did not file an injury report. In March 2006, Bodily received treatment for an acute lumbar strain with radicular symptoms that reportedly occurred when he tried to catch a falling transmission. The record contains no injury report for the 2006 incident. In March 2007, Bodily received treatment for back pain experienced after lifting a kitchen table. In May 2007, he received treatment for continuing back pain, and in September 2007, he received treatment for back pain after lifting landscape rocks.

[¶8]    On October 19, 2007, Bodily consulted Dr. Debra Steele, a neurosurgeon, for treatment of his back pain. An MRI ordered by Dr. Steele on that same date reported the following impression:

> L5-S1 degenerative disc disease with broad-based disc bulge eccentric to the left; there is some effacement of the left lateral recess with possible impingement of the left S1 nerve root and mild left-sided foraminal impingement. No disc herniation or significant spinal stenosis.

[¶9]    Dr. Steele noted that the MRI showed "decreased disc height with disc desiccation at the L5-S1 level and a disc herniation slightly eccentric to the left." Dr. Steele reported

2

her impression as "[l]ow back and left lower extremity pain secondary to the L5-S1 level," and recommended epidural steroid injections.

[¶10] On November 28, 2007, Bodily wrote to the Division requesting benefits to cover the medical expenses he had incurred in 2007 to treat his back pain. He wrote, in part:

> . . . I have enclosed doctor & prescription bills that I have incurred since March of this year that I have paid for out of my pocket. As you know from my Workers Comp notes I have dealt with and this going (sic) back injury originating at JTL in March 1996. I dealt with back pain from the original injury the best I could until July 2004 when I requested the case be reopened because the pain was more than I could tolerate. At that point I doctored it the best I could until it was tolerable again. It has continuously gotten worse and I have had to seek more drastic medical treatment such as injections to get through daily life. I have requested Wyoming Neurosurgery to forward you notes and bills that I have incurred in the last couple months.

[¶11] On December 4, 2007, the Division responded to Bodily with a request for additional information. The Division received the additional information from Bodily on December 20, 2007.

[¶12] In the meantime, Bodily continued to see Dr. Steele with reports of continuing and increased pain with activity and travel. Dr. Steele ordered a repeat MRI, which was done on January 3, 2008. The MRI report contained the following impression:

> 1. Small L5-S1 disc protrusion, asymmetric to the left, which mildly displaces the descending left S1 nerve root posteriorly.
> 2. Minimal, if any, right lateral L4-L5 disc protrusion.
> Overall, no significant change from 10/19/2007.

[¶13] Dr. Steele reviewed the MRI and reported that the MRI reflected "disc desiccation present at L5-S1 with a significant disc bulge." On January 9, 2008, Dr. Steele performed an L5-S1 microlumbar discectomy. At a January 18, 2008 follow-up appointment, Bodily reported that he was no longer experiencing back pain, or numbness and tingling in his lower extremities.

[¶14] On January 28, 2008, the Division issued a final determination denying benefits for Bodily's back injury for any treatment after June 2, 2005, stating as the basis for the denial that such treatment was "not related to the resolved work injury of July 8, 2004."

3

Bodily objected to the denial and requested a hearing, and the matter was referred to the OAH. The OAH entered summary judgment in favor of the Division, and Bodily appealed. *Bodily v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 149, ¶ 1, 265 P.3d 995, 995 (Wyo. 2011). This Court reversed the summary judgment and remanded for a contested case hearing on the question of whether Bodily's back pain after June 2005 was related to his work-related injuries in 1996 and 2005. *Id.*, ¶¶ 16-17, 265 P.3d at 1000-01.

[¶15] While Bodily's appeal was pending, he received treatment for low back pain that had returned some time after the surgery by Dr. Steele. On September 27, 2011, Bodily sought treatment from Dr. Kenneth Pettine and reported to Dr. Pettine that he was experiencing "chronic severe, incapacitating back pain with some radiating leg symptoms but predominantly severe ongoing low back pain." Dr. Pettine diagnosed Bodily as suffering from "[s]evere discogenic back pain with disc abnormalities at L5-S1." On December 14, 2011, Dr. Pettine performed surgery on Bodily's spine, which included a complete discectomy with implant of an artificial disc at L5-S1.

[¶16] Following this Court's decision reversing summary judgment, the Division referred the denial of Bodily's claim to the OAH for a contested case hearing. An evidentiary hearing was held on July 12, 2012, and on August 13, 2012, the OAH issued its Findings of Fact, Conclusions of Law, and Order upholding the Division's denial of benefits. In so ordering, the OAH found that the testimony presented by the Division's expert was more persuasive than that presented by Bodily's treating physician. Relying on the Division's expert testimony, the OAH concluded that Bodily's back pain in 2007 and the surgeries in 2008 and 2011 were not related to the 1996 or 2004 work injuries and were instead caused by continuing degenerative disc disease.

[¶17] Bodily sought judicial review of the OAH decision, and the district court affirmed. Bodily thereafter filed a timely notice of appeal.

## STANDARD OF REVIEW

[¶18] In an appeal from a district court's appellate review of an administrative decision, we review the case as if it came directly from the administrative body, affording no special deference to the district court's decision. *Stallman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 28, ¶ 27, 297 P.3d 82, 89 (Wyo. 2013); *DeLoge v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 154, ¶ 5, 264 P.3d 28, 30 (Wyo. 2011). Our review of administrative decisions is governed by the Wyoming Administrative Procedure Act, which provides:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory

provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

  (i) Compel agency action unlawfully withheld or unreasonably delayed; and

  (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>
> (B) Contrary to constitutional right, power, privilege or immunity;
>
> (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
>
> (D) Without observance of procedure required by law; or
>
> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c)(ii) (LexisNexis 2013).

[¶19] In keeping with the APA's statutory framework, our review is as follows:

> We review an administrative agency's findings of fact pursuant to the substantial evidence test. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.*, ¶ 11, 188 P.3d at 558. Findings of fact are supported by substantial evidence if, from the evidence in the record, this Court can discern a rational premise for the agency's findings. *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 118, ¶ 11, 259 P.3d 1161, 1164 (Wyo. 2011).
>
> Where the hearing examiner determines that the burdened party failed to meet his burden of proof, we must decide whether that determination was contrary to the overwhelming weight of the evidence. *Leavitt v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 95, ¶ 18, 307 P.3d 835, 840 (Wyo. 2013). We defer to the hearing

examiner's determination of witness credibility unless it is clearly contrary to the overwhelming weight of the evidence. *Id.*

*Trump v. State ex rel. Wyo. Workers' Comp. Div.*, 2013 WY 140, ¶¶ 17-18, 312 P.3d 802, 808 (Wyo. 2013).

## DISCUSSION

[¶20]   Bodily contends that the OAH failed to consider the evidence as a whole and erred in failing to give weight to Bodily's testimony and in giving greater weight to the opinion of the Division's independent medical examiner than to the opinion of Bodily's treating physician, Dr. Pettine.  Based on our review of the record and the hearing examiner's reasoning in weighing the expert testimony, we conclude that the hearing examiner's decision was supported by substantial evidence and not contrary to the overwhelming weight of the evidence.

[¶21]   Bodily asserts that the treatment for his back pain after June 2005 is compensable under the "second compensable injury rule."  The second compensable injury rule is a causation rule that "applies when 'an initial compensable injury ripens into a condition requiring additional medical intervention.'"  *In re Workers' Comp. Claim of Kaczmarek ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 110, ¶ 9, 215 P.3d 277, 282 (Wyo. 2009) (quoting *Yenne–Tully v. State ex rel. Wyo. Workers' Safety and Compensation Div.*, 12 P.3d 170, 172 (Wyo. 2000)).  Our analysis under the rule is as follows:

> "Under the second compensable injury rule, a subsequent injury or condition is compensable if it is causally related to the initial compensable injury." [*Rogers v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 117, ¶ 14, 284 P.3d 815, 819 (Wyo. 2012).]   As with claims for benefits arising from an initial injury, an employee claiming entitlement to benefits under the second compensable injury rule has the burden of proving "a causal connection exists between a work-related injury and the injury for which worker's compensation benefits are being sought." *Davenport*, ¶ 21, 268 P.3d at 1044 (citation omitted).

*Hoffman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 164, ¶ 9, 291 P.3d 297, 301 (Wyo. 2012).

[¶22]   In support of his claim that the 1996 work injury caused his L5-S1 disc herniation, Bodily presented evidence that included his own testimony and the testimony of two of his treating physicians, Dr. Steele and Dr. Pettine.  In response, the Division presented

6

the opinion of its independent medical examiner, Dr. Anthony Dwyer. We will set forth the relevant portions of this evidence and then address Bodily's contentions regarding the evidence.

[¶23] In support of his causation argument, Bodily testified that following his injury in 1996, his back pain remained constant.

> Q. Between 1996 and the fall of 2007 did your lower back ever return to how it was prior to that first back injury?
>
> A. I would say there was never a week throughout that period that I did not spend the evenings on ice and heat, that I self-medicated myself to try to – um, I did not want to be a black eye to JTL. I was trying to – um, prosper at this company. And from what I had heard and been told, to be filing these huge claims and everything was – it was definitely not a good check.
> So I – I just basically – my – my wife knew when I came home to have the heating pad ready, the ice pack ready. And I continued that self-therapy ever since 1996.

[¶24] Bodily also presented the opinion of Dr. Steele. Dr. Steele performed Bodily's first surgery, and she provided deposition testimony concerning the cause of the L5-S1 disc herniation she treated. That same deposition testimony was submitted during the summary judgment and contested case proceedings, and this Court quoted as follows from the testimony when we reversed the OAH's entry of summary judgment:

> [Question by counsel for Mr. Bodily]. One of the questions I have is, based upon actually seeing that disc and also having reviewed it on the MRI, can you date the onset of that herniation, of the lesion, whatever you call it, and say, yes, that disc herniated back in 1996 or 1999 or 2004? Can you say that at all?
>
> [Dr. Steele]. No.
>
> Q. Did it look like something that had occurred within the last three months or four months? Can you date it that way?
>
> A. Cannot say.
>
> . . .

7

Q. So, your opinion that you have expressed here today about the causation of this disc herniation that you addressed in the surgery on January 9th is dependent upon the accuracy of the history that Mr. Bodily provided you.

. . .

A. I don't know what caused his disc herniation. The history given by Mr. Bodily does guide the treatment plan, however.

Q. And it's certainly possible that he herniated his disc back in 2004 during this incident?

A. It is possible, yes.

Q. It's not inconceivable.

A. Correct.

Q. It's medically possible given what you have seen and your training that he could have herniated his disc back in 2004 as described here on this report.

A. Yes, that is possible.

Later, Dr. Steele testified as follows:

[Question by Division]. My first question is, have you reviewed any other medical records from any source other than your own regarding Mr. Bodily?

A. No.

Q. Let me show you what we're going to mark as Exhibit 3. This is a record from Dr. Rita Emch. Would you please review that quickly?

. . .

Q. Do you see where he goes in and gives a history of lifting a Buick?

A. Yes.

Q. Could an event such as this have caused the herniation that you operated on in 2008?

8

A. Yes.

Q. I have another medical record from Urgent Care. Now, progress notes dated 3–27–07 we'll mark as Exhibit 4. I would like you to look at where he gives a history of present illness on that. Do you see where it says he lifted a kitchen table on Friday?

A. Yes.

Q. Pain on Sunday in his back and hips radiating down both legs?

A. Yes.

Q. Could this event have caused the disc herniation at L5–S1 that you operated on in January of 2008?

A. It could have.

Q. I am going to mark this one Number 5. This is from InstaCare of Casper dated September 2, 2007. If you could look at this, patient's complaints there. Do you see where he complains of lifting landscaping rock and injuring his back?

A. Yes.

Q. Could this event have caused the disc herniation which you operated on in January of 2008?

A. It could have.

. . .

Q. Looking at Exhibits A, B and C, which are other records of Mr. Bodily, is it possible for you to give an opinion to a reasonable degree of medical probability what caused his disc herniation which you operated on in January 2008?

A. I cannot knowingly state if he had a disc herniation in 1999 or if any one of these events caused the appearance of his abnormal disc that was noted on the 2007 MRI.

*Bodily*, ¶ 8, 265 P.3d at 997-98.

[¶25]  Finally, Bodily presented the opinion of Dr. Pettine on the relationship between Bodily's 1996 work injury and his later diagnosed disc herniation.  Dr. Pettine performed

9

the second surgery on Bodily, replacing the L5-S1 disc with an artificial disc. He testified as follows on direct examination by Bodily's counsel:

> Q. … What I'm wondering is, in your opinion, to a reasonable degree of medical probability, is it more probable than not that the surgery that Dr. Steele performed in 2008 ripened out of or arose from those prior workplace injuries?
>
> . . .
>
> A. … I definitely believe that's the case to a degree of medical probability.
>
> Q. Explain your thinking in that regard, Doctor.
>
> A. Yes. Well, I would relate it – an analogy I just thought of is if – is if Rick had broken his leg in a work injury in '96. And let's just say he had that leg treated, but the fracture never healed. And so basically he's been walking on a bone that hasn't healed in his leg, and intermittently he injures it and exacerbates his symptoms. You know, I think, likewise, he fractured or tore his disk in his back in '96 and has had intermittent exacerbations that have gradually gotten worse. One of those exacerbations occurred in 2008, which required the discectomy. And, unfortunately, he had ongoing symptoms consistent with discogenic pain which resulted in the replacement of his disk, which occurred at the end of 2011.
>
> Q. How does the overlay of degenerative disk disease, what role does that play?
>
> A. That is a sequelae of the original injury in '96. In other words, it's well known that if you tear a disk or damage it, that it undergoes fairly rapid degeneration, which I think Mr. Bodily demonstrates.
>
> Q. So is it your opinion that the 1996 and the 2004 injuries eventually developed to the point where he needed that surgery in 2008 and he needed the surgery in 2011?
>
> A. Yes.

Q. And that's because they – because of the degenerative disk disease or –

A. No. Because he tore the disk in '96.

[¶26] On cross-examination, Dr. Pettine testified:

Q. And what's the basis for your opinion that [Bodily] did, in fact, tear a disk at L5-S1 in 1996?

A. Based on his history and what I observed at the time of surgery.

Q. And is that based on history solely from the patient, or did your review medical records or have some other source?

A. No. That was from the patient's history.

Q. Have you reviewed any of the medical records from that work injury in 1996?

A. No.

Q. Have you reviewed any medical records from any source besides your own chart, which we've discussed here today –

A. No.

Q. -- indicating Mr. Bodily?

A. No.

Q. And tell me how you can say that, based on the appearance of the disk at surgery, he must have torn it in 1996.

A. Oh, just based on the tears that I observed.

Q. Could other incidents or injury have caused those tears?

A. It's possible.

Q. What other types of injuries would that be?

11

A. Oh, if he had a history of falling off a roof or getting tossed off a horse or something along those lines.

Q. Can lifting heavy objects cause those kinds of tears?

A. It's possible.

Q. What did Mr. Bodily tell you occurred in the work injury in 1996?

A. He was trying to pull a muffler off of a piece of equipment.

Q. Would that, in your opinion, be something that could cause a disk herniation at L5-S1?

A. Yeah.

Q. Did he tell you that he herniated a lumbar disk in that work injury in 1996?

A. Yes.

[¶27] The Division retained Dr. Dwyer, an orthopedic surgeon, to perform an independent medical examination of Bodily. Dr. Dwyer's report was admitted into evidence, but he did not testify. In completing his evaluation, Dr. Dwyer interviewed and examined Bodily, and also reviewed records relating to Bodily's back injury, including:

1. First Report of Injury
2. Medical report order.
3. Legal documents.
4. Deposition of Debra Steele.
5. Radiology, July 9, 2004 to December 3, 2010.
6. Laboratory studies, February 26, 1999 to January 3, 2008.
7. Cheyenne Regional Medical Center, January 9, 2008 to January 10, 2008.
8. Wyoming Medical Center, November 22, 1989 to February 7, 2005.
9. Urgent Care Now, March 27, 2007 to May 15, 2007.
10. InstaCare of Casper, September 2, 2007.
11. Kenneth Pettine, M.D., September 27, 2011.

12. Debra Steele, M.D., October 19, 2007 to February 19, 2008.
13. Rita Emch, M.D., March 11, 1996 to October 14, 2005.
14. Madeline Stout, D.C., July 8, 2004 to May 9, 2005.

[¶28] After completing his interview, examination, and record review, Dr. Dwyer provided the following assessment of Bodily's condition:

It is my opinion within medical probability that the patient's conditions are as follows:
1. Chronic low back pain.
2. Lumbar degenerative disc disease, specifically at L5-S1.
3. Status postop left L5-S1 decompression of January 2008 and total disc replacement at L5-S1 of December 2011.

[¶29] In response to the Division's specific interrogatives, Dr. Dwyer opined as follows:

**1. What was the precipitating condition or incident that is the source of current complaints?**

I consider that Mr. Bodily has sustained a number of injuries to the lumbar spine of a twisting nature, which can be classified as a lumbar sprain or strain. His current lumbar condition is also largely related to continuing lumbar disc degeneration. I base this opinion on the history details given to me by Mr. Bodily and specifically on the objective information in the plain x-rays of the lumbar spine dated July 9, 2004, with the impression "Negative lumbar spine series." Though there was no MRI on this date, the fact that there was maintenance of normal lumbar disc height indicates the reason for the radiologist's conclusion.

My opinion of continuing disc degeneration is also supported by the objective findings on the first MRI available to me of October 19, 2007, which indicates, "There is minimal loss of disc space height with some end plate sclerosis at the L5-S1 level consistent with degenerative disc disease."

The next MRI of October 2007 has a report indicating degenerative disc disease at L5-S1 with the addition of a

"broad-based disc bulge slightly eccentric to the left." Following this MRI, Dr. Steele noted increasing symptom following a long Thanksgiving drive.

The next available MRI report of January 3, 2008 indicates some continuing deterioration, with the impression of "Small L5-S1 disc protrusion." The report also states, "There is loss of T2 disc signal and disc height at L5-S1 secondary to degenerative disc disease, unchanged." This MRI report was comparing the findings to those of the October 2007 report.

However, this is the first radiological report of loss of disc height in the lumbar spine since the plain lumbar films of July 9, 2004, which indicated "Negative lumbar spine series."

The last MRI report available to me was that of December 3, 2010, which indicated postoperative changes following the left L5-S1 procedure. It notes "Loss of disc space height at L5-S1, lumbar disc otherwise relatively well preserved."

. . .

**3.     Are current symptoms or complaints due to a work injury claimed from 1996 or 7-8-2004?**

The patient affirms that he considers that his current problems are all related to the injury of 1996 and not to the July 2004 injury.

As stated above, I consider that the patient's current symptoms and complaints, and indeed the two surgeries performed in January 2008 and December 2011, are not simply and solely related to the listed episodes of trauma but also to a large degree to continuing degeneration.

**4.     Was the back surgery at L5-S1 in 2008 required, reasonable and necessary due to a work related injury?**

In my medical opinion within medical probability, Mr. Bodily sustained a number of twisting injuries to the spine or sprains, and the initial films of July 9, 2004 indicated a negative lumbar spine series. It is my opinion that the majority of causation and need for the lumbar surgery in January 2008 was related to continuing lumbar degeneration and not to the listed episode of sprain and strain of July 8, 200[4], which

was not associated with significant loss of work or lifting restrictions. History indicates that they responded to the passage of time and to chiropractic treatment in a way that would be expected with lumbar sprain or strain.

**5. Was the back surgery (artificial disk replacement) performed on 12/14/11 required, reasonable and necessary due to a work related injury?**

No. My answer to this interrogative is the same as that listed under interrogative number 4, with the addition that the trauma to the L5-S1 disc sustained in the January 2008 surgery would be considered to have increased the degree of lumbar disc degeneration.

[¶30] Where a hearing examiner is presented with conflicting expert testimony on the question of causation, we recognize that it is the hearing examiner's task to determine the relative weight to be accorded to each expert's testimony.

> When conflicting medical opinions are presented at the contested case hearing, the agency has the
>
>> responsibility, as the trier of fact, to determine relevancy, assign probative value, and ascribe the relevant weight given to the evidence presented. *Clark v. State ex rel. Wyoming Workers' Safety & Compensation Div.*, 934 P.2d 1269, 1271 (Wyo. 1997). The [agency] is in the best position to judge and weigh medical evidence and may disregard an expert opinion if it finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based. *Id.*; *Matter of Goddard*, 914 P.2d 1233, 1238 (Wyo. 1996).
>
> *Spletzer v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 90, ¶ 21, 116 P.3d 1103, 1112 (Wyo. 2005). We do not re-weigh the evidence, but defer to the agency's decision so long as it is based on relevant evidence that a reasonable mind might accept as supporting that decision. *Id.*, ¶ 22, 116 P.3d at 1112.

*Trump*, ¶ 22, 312 P.3d at 810 (quoting *Hayes v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 96, ¶ 16, 307 P.3d 843, 849 (Wyo. 2013)).

[¶31] In performing the task of weighing the expert testimony in the present case, the

hearing examiner considered four factors this Court has observed as useful in weighing conflicting medical opinions: the opinion; the reasons for the opinion; the strength of the opinion; and the qualifications and credibility of the expert giving the opinion. *See Baxter v. Sinclair Oil Corp.*, 2004 WY 138, ¶ 9, 100 P.3d 427, 431 (Wyo. 2004). The hearing examiner concluded:

> 98. Thus, weighing the factors set forth in *Baxter*, this Hearing Examiner found Dr. Dwyer's opinion and, to some extent, Dr. Steele's opinions[,] more helpful than the opinion of Dr. Pettine and weighed Dr. Dwyer's opinions more heavily than it weighed the opinions of Dr. Pettine. This Hearing Examiner finds and concludes Dr. Dwyer's opinions that continuing degenerative disc disease was the primary cause of Bodily's back condition and pain symptoms and the two documented work injuries were not, were supported by the evidence and more clearly explained. The opinions of Dr. Pettine were not as clearly supported by the evidence or justified, as he had not reviewed any of Bodily's other medical records, and he did not recall reviewing the imaging studies in the record, other than the MRI he ordered.

> . . . .

> 106. This Hearing Examiner finds and concludes Dr. Pettine opined Bodily's pain symptoms and back condition in 2007 and the surgeries in 2008 and 2011 were causally related to the 1996 work-related injury, based upon the history of a herniated disc in 1996, provided by Bodily, and Dr. Pettine's observations concerning the L5/S1 disc at the time of the 2011 surgery. This Hearing Examiner finds and concludes the opinions of Dr. Pettine are given little, if any, weight, as they are based on a herniated disc in 1996, not supported by the imaging studies, and that Dr. Pettine had not reviewed any medical records, other than his own, or reviewed the other imaging studies other than the one he ordered.

> 107. This Hearing Examiner finds and concludes Dr. Dwyer opined Bodily's pain complaints in 2007 and the subsequent surgeries in 2008 and 2011 were not related to the 1996 or 2004 work injuries and were caused by continuing degenerative disc disease. This Hearing Examiner finds and concludes Dr. Dwyer's opinions that continuing degenerative disc disease was the primary cause of Bodily's back condition

and pain symptoms, and the two documented work injuries were not, were supported by the evidence and more clearly explained.

[¶32] Bodily argues that the hearing examiner's conclusions were flawed because they disregarded Bodily's hearing testimony, which Bodily contends was credible evidence of causation. We disagree that the hearing examiner disregarded Bodily's testimony or that Bodily's testimony was sufficient in itself to establish causation.

[¶33] The hearing examiner made detailed findings concerning Bodily's testimony, acknowledged Bodily's testimony that he had recurring and ongoing back pain from 1996 to 2008, and found Bodily to be credible and believable. The hearing examiner thus clearly did consider Bodily's testimony. The hearing examiner also noted, however, that under the applicable law, expert testimony is required to establish causation unless the injury is "immediately and directly or naturally and probably the result of an accident." We agree with this statement of the law, and our recent application of this law illustrates why Bodily's testimony alone was insufficient to establish causation:

> We recently noted in *Jacobs v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 62, ¶ 11 n. 1, 301 P.3d 137, 142 n. 1 (Wyo. 2013), that expert medical testimony is not always necessary to establish causation. Expert medical testimony may not be required where the medical condition complained of is "immediately and directly or naturally and probably" the result of the workplace incident. *Id.* (citing *Middlemass*, ¶ 34, 259 P.3d at 1169). In the present case, however, neither Dr. Rangitsch nor Dr. Kuhn suggested that Mr. Trump's 2009 meniscus tear was an expected or natural result of his 1993 injury. Rather, as noted by the hearing examiner, both experts testified that a torn meniscus typically results from acute trauma to the knee, such as forceful twisting or shearing. Additionally, the simple fact that nearly 16 years had elapsed between Mr. Trump's accident and the condition at issue in this case suggests the need for expert testimony in order to establish causation. For these reasons, we conclude that the hearing examiner's finding is supported by substantial evidence.

*Trump*, ¶ 32, 312 P.3d at 813-14.

[¶34] This case presents a similar set of circumstances. Drs. Steele, Pettine, and Dwyer provided varying opinions, but none of them opined that the presence of recurring back pain alone was sufficient to establish the timing and cause of Bodily's disc herniation.

17

Also, similar to *Trump*, more than eleven years elapsed between the date of Bodily's original work injury in 1996 and his herniation diagnosis in 2007. Because the record contains no evidence suggesting that Bodily's herniation "immediately and directly or naturally and probably" resulted from the 1996 work incident, we find no error in the hearing examiner's reliance on the expert testimony, rather than on Bodily's testimony, to answer the causation question.

[¶35] We turn then to the conflicting opinions and Bodily's argument that the hearing examiner's weighing of those opinions was likewise flawed. Bodily argues that Dr. Dwyer's opinion should have been given less weight for two reasons. First, Bodily contends that Dr. Dwyer's opinion lacked foundation because he did not perform either surgery and never "saw inside" or "laid hands on" Bodily, as did Dr. Steele and Dr. Pettine. Second, Bodily contends that Dr. Dwyer's opinion was less reliable because it was not provided through sworn testimony or subject to cross-examination. We reject the argument that either of these contentions provides a basis for this Court to reweigh the conflicting expert opinions.

[¶36] The argument that Dr. Dwyer's opinion is less credible because he did not operate on Bodily apparently presumes that an inside view of the disc would reveal some characteristic of the damage, which would in turn disclose the cause and timing of the herniation. As reflected in Dr. Pettine's above-quoted testimony, however, he did not explain how an inside look at the disc could or did inform his viewpoint. Moreover, even with his internal look at the tears, Dr. Pettine agreed that other causes of the herniation were possible. Dr. Pettine's opinion of the timing and cause of the herniation, based on the tears he observed, was thus far from definitive. Additionally, Dr. Pettine's observations were undermined by the testimony of Dr. Steele's, who also operated on Bodily's herniated L5-S1 disc. Despite her internal view of the damage, Dr. Steele testified that she could not say what caused the herniation or when it occurred. We therefore conclude that the record does not support Bodily's argument that Dr. Pettine's opinion should have been afforded greater weight simply because he was one of the operating physicians.

[¶37] With respect to Bodily's argument that Dr. Dwyer's opinion is entitled to less weight because it was not provided through sworn testimony, we agree with the district court's analysis in rejecting this argument:

> The Hearing Examiner in this case performed a thorough review of the case. He was confronted with a difficult decision; on one hand, [Bodily] presented Dr. Pettine who testified and was subject to cross-examination. However, Dr. Pettine conceded that his review of [Bodily's] medical history was extremely limited. On the other hand, the Division presented the report of Dr. Dwyer, whose review

18

of the medical records was more exhaustive, but Dr. Dwyer did not testify under oath and he was not subjected to cross-examination. The Hearing Examiner then had to choose between sworn, but somewhat incomplete testimony at one end of the spectrum, and a more complete but unsworn or challenged medical report at the other end.

. . . .

[Bodily] did not object to Dr. Dwyer's report, and apparently chose not to either depose him or call him as a witness in this matter. [Bodily] argues that the report should be accorded lesser weight than the sworn testimony of Dr. Pettine, but he offers no authority to support this contention. Therefore, there is no basis in law to accord this report lesser weight than was given to the testimony of Dr. Pettine. This Court does not re-weigh the evidence or second-guess the fact finder. The Hearing Examiner determined that the opinions of Dr. Dwyer and Dr. Steele were more persuasive than that of Dr. Pettine. The evidence in support of this decision is clearly more than a scintilla of evidence. The Court finds that the Hearing Examiner's findings are supported by substantial evidence in the record.

[¶38] The hearing examiner gave greater weight to Dr. Dwyer's opinion than to Dr. Pettine's opinion because he found Dr. Dwyer's opinion to be better and more fully explained and because Dr. Pettine's opinion was based on an incomplete medical history. That determination is supported by the record, and we find no error in the hearing examiner's decision. *See Taylor v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 148, ¶ 15, 123 P.3d 143, 148 (Wyo. 2005) ("[A] hearing examiner is entitled to disregard an expert opinion if he finds the opinion unreasonable, not adequately supported by the facts upon which the opinion is based, or based upon an incomplete and inaccurate medical history provided by the claimant.").

## CONCLUSION

[¶39] The OAH decision upholding the Division's denial of benefits was supported by substantial evidence and not contrary to the overwhelming weight of the evidence. Affirmed.

19